*Suffolk Superior Civil # 05 - 3275A* ✓

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FANEUIL HALL MARKETPLACE, LLC,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THOMAS E. BROWN and** | ) |
| **STEPHANIE L. BROWN,** | ) |
| | ) |
| **Defendants** | ) |

*USD # 11760 RJS*
*05-CV-11760*

## NOTICE OF REMOVAL
## AND
## JURY DEMAND

*NOW COMES* the Defendant Stephanie L. Brown, by her attorneys Ford, Weave & McDonald, P.A., pursuant to 20 U.S.C. § 1446(b) and provides notice of its removal of this civil action which is pending in the Suffolk County Superior Court as Docket No 05-3275A, and in support thereof says as follows:

1.      Stephanie L. Brown is a defendant in a matter brought in the Csuperior Court Department of the Trial Court in the Commonwealth of Massachusetts, Suffolk County Captioned <u>Faneuil Hall Marketplace, LLC v. Thomas Brown et. al.</u>, Action No. 05-3275A. A copy of the initial pleading filed in this proceeding is attached hereto as *Exhibit A*.

2.      The Defendant received a copy of it at some date after August 4, 2005. Because this Notice is filed less than thirty (30) days thereafter it is timely.  28 U.S.C. §1446(b).

3.      This action is removable pursuant to 28 U.S.C. § 1441(a) inasmuch as the District Courts of the United States have original jurisdiction over this proceeding. The District Courts of the United States have original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332

as the action is between citizens of different states, and the action involves a matter in

controversy in excess of $75,000.00.

4.     Pursuant to 28 U.S.C. §1446(d) a copy of this notice shall be promptly filed with

the Suffolk County Superior Court.

5.     Pursuant to F.R.Civ.P 38 (b) Stephanie L. Brown demands a trial by jury of all

issue triable by a jury.

*WHEREFORE*, Stephanie L. Brown respectfully requests this Honorable Court order

and decree as follows:

      A.     That the matter be removed;

      B.     That all matters triable to a jury be so tried; and

      C.     For such other and further relief as is just and equitable.

                    Respectfully submitted,
                    STEPHANIE L. BROWN

                    By Her Attorneys,
                    FORD, WEAVER & McDONALD, P.A.

Dated:  August 24, 2005                 By: _____

                    Edmond J. Ford, Esquire (BBO 646710)
                    10 Pleasant Street, Suite 400
                    Portsmouth, New Hampshire 03801
                    (603) 433-2002 Telephone
                    (603) 433-2122 Facsimile
                    eford@fordandweaver.com

## CERTIFICATE OF SERVICE

      I hereby certify that on August 24, 2005 a copy of the foregoing Statement of Reasons
Including Supporting Authorities has been forwarded via United States First Class Mail, postage
prepaid, to the following parties:

2

Anthony M. Moccia
ECKERT SEAMANS CHERIN &
MELLOT, LLC
1 International Place
Boston MA 02110

Thomas Brown
30 Myrica Avenue
Rye, NH 03870

Clerk
Superior Court Administrative Office
Suffolk County Courthouse, 13th Floor
Three Pemberton Square
Boston, MA 02108

By: _____

Edmond J. Ford, Esquire

JS 44 (Rev. 11/04)

## COVER SHEET

The JS 44 civil cover sheet and the infor... r supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, appro... ted States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCT...

### I. (a) PLAINTIFFS
Faneuil Hall Marketplace, LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Anthony M Boccia, Eckert Seamans Cherin & Mellott, LLC, One International Place, 18th Floor, Boston, MA 02110 617-342-6899

### DEFENDANTS
Thomas E Brown & Stephanie L. Brown

County of Residence of First Listed Defendant    Rockingham County, NH
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

Edmond Ford, Ford, Weaver & McDonald, PA, 10 Pleasant St., Suite 400, Portsmouth, NH 03801 603-433-2002

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | ☐ 950 Constitutionality of |
| | Other | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | |

### V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC Sect. 1332
Brief description of cause:
Action on Lease Guaranty

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 625,506.91
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE
08/24/2005

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse (Rev. 11/04)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

*Suffolk  Superior  Civil  # 05-3275A*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **FANEUIL HALL MARKETPLACE, LLC,** | ) |
| **Plaintiff** | ) **05 - 11760 RGS** |
|  | ) |
| **v.** | ) |
|  | ) |
| **THOMAS E. BROWN and** | ) |
| **STEPHANIE L. BROWN,** | ) |
|  | ) |
| **Defendants** | ) |

**NOTICE OF REMOVAL
AND
JURY DEMAND**

*NOW COMES* the Defendant Stephanie L. Brown, by her attorneys Ford, Weave &

McDonald, P.A., pursuant to 20 U.S.C. § 1446(b) and provides notice of its removal of this civil

action which is pending in the Suffolk County Superior Court as Docket No 05-3275A, and in

support thereof says as follows:

1. Stephanie L. Brown is a defendant in a matter brought in the Csuperior Court

Department of the Trial Court in the Commonwealth of Massachusetts, Suffolk County

Captioned <u>Faneuil Hall Marketplace, LLC v. Thomas Brown et. al.</u>, Action No. 05-3275A. A

copy of the initial pleading filed in this proceeding is attached hereto as *Exhibit A*.

2. The Defendant received a copy of it at some date after August 4, 2005. Because

this Notice is filed less than thirty (30) days thereafter it is timely. 28 U.S.C. §1446(b).

3. This action is removable pursuant to 28 U.S.C. § 1441(a) inasmuch as the District

Courts of the United States have original jurisdiction over this proceeding. The District Courts

of the United States have original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332

as the action is between citizens of different states, and the action involves a matter in controversy in excess of $75,000.00.

4.    Pursuant to 28 U.S.C. §1446(d) a copy of this notice shall be promptly filed with the Suffolk County Superior Court.

5.    Pursuant to F.R.Civ.P 38 (b) Stephanie L. Brown demands a trial by jury of all issue triable by a jury.

*WHEREFORE*, Stephanie L. Brown respectfully requests this Honorable Court order and decree as follows:

    A.    That the matter be removed;

    B.    That all matters triable to a jury be so tried; and

    C.    For such other and further relief as is just and equitable.

                                    Respectfully submitted,
                                    STEPHANIE L. BROWN

                                    By Her Attorneys,
                                    FORD, WEAVER & McDONALD, P.A.

Dated: August 24, 2005          By: _____

                                    Edmond J. Ford, Esquire (BBO 646710)
                                    10 Pleasant Street, Suite 400
                                    Portsmouth, New Hampshire 03801
                                    (603) 433-2002 Telephone
                                    (603) 433-2122 Facsimile
                                    eford@fordandweaver.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2005 a copy of the foregoing Statement of Reasons Including Supporting Authorities has been forwarded via United States First Class Mail, postage prepaid, to the following parties:

2

MASXP-2C050325
guen

**Commonwealth of Massachusetts**
**SUFFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## SUCV2005-03275
### Faneuil Hall Mkpl LLC v Brown aka et al

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 08/03/2005 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 08/25/2005 | **Session** | A - Civil A, 3 Pemberton Square, Boston | | |
| **Origin** | 1 | **Case Type** | A08 - Sale/lease real estate | | |
| **Lead Case** | | **Track** | F | | |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 11/01/2005 | **Answer** | 12/31/2005 | **Rule12/19/20** | 12/31/2005 |
| **Rule 15** | 12/31/2005 | **Discovery** | 05/30/2006 | **Rule 56** | 06/29/2006 |
| **Final PTC** | 07/29/2006 | **Disposition** | 09/27/2006 | **Jury Trial** | No |

### PARTIES

**Plaintiff**
Faneuil Hall Mkpl LLC
Active 08/03/2005

**Private Counsel 350225**
Anthony M Moccia
Eckert Seamans Cherin & Mellott
One International Place
18th Floor
Boston, MA 02110
Phone: 617-342-6800
Fax: 617-342-6899
Active 08/03/2005 Notify

**Defendant**
Thomas  Brown aka
Served: 08/04/2005
Served (answr pending) 08/11/2005

**Alias defendant name**
Thomas A  Brown
Active 08/03/2005

**Defendant**
Stephanie  Brown aka
Served: 08/04/2005
Served (answr pending) 08/11/2005

MASXP-20050325
guen

08/25/2005
03:54 PM

**Commonwealth of Massachusetts**
**SUFFOLK SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## SUCV2005-03275
## Faneuil Hall Mkpl LLC v Brown aka et al

**Alias defendant name**
Stephanie L Brown
Active 08/03/2005

**Private Counsel 646710**
Edmond J Ford
Ford & Weaver, PA
10 Pleasant Street, Suite 400
Portsmouth, NH 03801
Phone: 603-433-2122
Active 08/25/2005 Notify

**ENTRIES**

| Date | Paper | Text |
|------|-------|------|
| 08/03/2005 | 1.0 | Complaint |
| 08/03/2005 | | Origin 1, Type A08, Track F. |
| 08/03/2005 | 2.0 | Civil action cover sheet filed |
| 08/11/2005 | 3.0 | SERVICE RETURNED: Thomas Brown aka(Defendant) (Certified mail |
| 08/11/2005 | 4.0 | SERVICE RETURNED: Stephanie Brown aka(Defendant) Certified mail |
| 08/25/2005 | | Cerified copy of petition for removal to U. S. Dist.Court of Deft. |
| | | Stephanie L. Brown U. S. Dist.#(05-CV-11760RJS). |
| 08/25/2005 | | Case REMOVED this date to US District Court of Massachusetts |

**EVENTS**

**I HEREBY ATTEST AND CERTIFY ON**

AUGUST 26, 2005, THAT THE

**FOREGOING DOCUMENT IS A FULL,**
**TRUE AND CORRECT COPY OF THE**
**ORIGINAL ON FILE IN MY OFFICE,**
**AND IN MY LEGAL CUSTODY.**

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

ASSISTANT CLERK.

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO.

FANEUIL HALL MARKETPLACE, LLC, )
    Plaintiff,              )
                            )
v.                          )
                            )
THOMAS BROWN, a/k/a THOMAS A.  )
BROWN AND STEPHANIE BROWN,    )
a/k/a STEPHANIE L. BROWN,        )
    Defendants.            )



## **COMPLAINT**

NOW COMES the Plaintiff, Faneuil Hall Marketplace, LLC ("Faneuil Hall"), and

complains of the Defendants, Thomas Brown and Stephanie Brown, as follows:

## **COUNT I**

1.     Faneuil Hall Marketplace, LLC is a limited liability company organized under the

laws of the State of Delaware with a usual place of business at Four South Market Street, Faneuil

Hall Marketplace, Boston, Suffolk County, Massachusetts.

2.     The Defendant, Thomas Brown, a/k/a Thomas A. Brown, is an individual who,

upon information and belief, resides at 30 Myrica Avenue, Rye Beach, New Hampshire.

3.     The Defendant, Stephanie Brown, a/k/a Stephanie L. Brown, is an individual who,

upon information and belief, resides at 30 Myrica Avenue, Rye Beach, New Hampshire.

4.     On or about March 14, 2002, Faneuil Hall Marketplace, Inc., as Landlord, and

R&B Enterprises, LLC, t/a Zoinks ("R&B"), as Tenant, entered into a written lease agreement

for approximately 7,669 square feet of space located on the street level and second level of North Market Building, Faneuil Hall Marketplace, Boston, Suffolk County, Massachusetts ("the Premises"). Faneuil Hall is the successor-in-interest to Faneuil Hall Marketplace, Inc. under the Lease.

5.    Also, on or about March 14, 2002, Thomas Brown and Stephanie Brown executed a written guaranty ("the Guaranty") of the obligations of R&B under the Lease. A copy of the Guaranty is annexed hereto as Exhibit "A", and made a part hereof.

6.    On or about March 29, 2004, Faneuil Hall and R&B executed a written First Amendment to Lease Agreement. The Lease Agreement and the First Amendment to Lease Agreement are hereinafter collectively referred to as the "Lease". A copy of the Lease is annexed hereto as Exhibit "B", and made a part hereof.

7.    Based upon the failure and refusal of R&B to pay rental and other sums of money due under the Lease within seven (7) days after the same became due, Faneuil Hall terminated the Lease by letter dated December 20, 2004. A copy of the Notice of Termination is annexed hereto as Exhibit "C", and made a part hereof.

8.    On or about January 17, 2005, Faneuil Hall entered a Summary Process Summons and Complaint against R&B seeking possession of the Premises and damages in the amount of $689,602.91, plus interest, costs, and attorney's fees in the action known as Faneuil Hall Marketplace, LLC v. R&B Enterprises, LLC, d/b Zoinks, Boston Municipal Court, Summary Process Action No. 2005-01-CE-0002 ("the BMC Action").

9.    On or about March 4, 2005, the Boston Municipal Court issued an Execution in the BMC Action in favor of Faneuil Hall for possession of the Premises and for damages in the amount of $744,510.33.

{K0306169.1}

10.     Despite repeated demands, the Defendants have failed and refused to pay to Faneuil Hall the sum of $625,506.91, plus interest, costs, and attorney's fees due under the Lease and the Guaranty. This sum is comprised of the amount of $596,078.40 which represents "twelve months of the applicable Rental due under the Lease" plus $29,428.51 which is the "unamortized amount of the Allowance (defined in Section 7.1 of the Rider to the Lease)" all as set forth in Section J. of the Guaranty. A copy of the Summary of Charges for R&B under the Lease is annexed hereto as Exhibit "D" and made a part hereof.

11.     As a result of the breach by the Defendants of the terms of the Guaranty, Faneuil Hall has suffered damage in the amount of $625,506.91, plus interest, costs and attorney's fees.

## COUNT II

12.     Faneuil Hall repeats and realleges the allegations contained in Paragraphs 1 through 11 as if each were separately and specifically set forth herein.

13.     The failure and refusal of the Defendants to pay the amounts due to Faneuil Hall under the terms of the Lease and the Guaranty constitutes an unfair and deceptive business practice within the meaning of Massachusetts General Laws, Chapter 93A.

14.     The violations of Massachusetts General Laws, Chapter 93A by the Defendants are knowing and willful violations.

15.     As a result of the Defendants' violations of Massachusetts General Laws, Chapter 93A, Faneuil Hall has suffered damage.

WHEREFORE, the Plaintiff, Faneuil Hall Marketplace, LLC, demands Judgment against the Defendants, Thomas Brown and Stephanie Brown, as follows:

{K0306169.1}

a)    That Judgment enter against the Defendants, Thomas Brown and Stephanie

Brown, jointly and severally, in the amount of $625,506.91, plus interest costs and attorney's

fees;

b)    That Judgment enter against the Defendants, Thomas Brown and Stephanie

Brown, jointly and severally, for treble damages, interest, costs, and attorney's fees; and

c)    That this Court award such other and further relief as it deems just and proper.

**FANEUIL HALL MARKETPLACE, LLC**

By its attorney,

Anthony M. Moccia, BBO #350225
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
One International.Place, 18th Floor
Boston, Massachusetts 02110
617.342.6828
Facsimile: 617.342.6899

DATED: $8.3.05$

**I HEREBY ATTEST AND CERTIFY ON**

AUGUST 26, 2005, THAT THE

**FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.**

**MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT**

ASSISTANT CLERK.

{K0306169.1}

## G U A R A N T Y

**MAR 1 4 2002**

ANNEXED TO AND FORMING A PART OF THE LEASE DATED
BETWEEN, FANEUIL HALL MARKETPLACE, INC., a Maryland corporation
("Landlord"), and R & B ENTERPRISES LLC, a Massachusetts limited
liability company t/a ZOINKS ("Tenant").

The undersigned, THOMAS BROWN and STEPHANIE BROWN ("Guarantor"),
whose address is 213 Hanover Street, Boston, MA 02113, in
consideration of the leasing of the Premises described in the annexed
Lease to the above named Tenant, does hereby covenant and agree:

A.    That if Tenant shall default in the performance of any of the
      covenants and obligations of said Lease on Tenant's part to be
      performed, then Guarantor will on demand well and truly perform
      the covenants and obligations of said Lease on Tenant's part to
      be performed and will on demand pay to Landlord any and all sums
      due to Landlord, including all damages and expenses that may
      arise in consequence of Tenant's default, and Guarantor does
      hereby waive all requirements of notice of the acceptance of this
      Guaranty and all requirements of notice of breach or
      non-performance by Tenant.

B.    That Guarantor may, at Landlord's option, be joined in any action
      or proceeding commenced by Landlord against Tenant in connection
      with and based upon any covenants and obligations in said Lease,
      and Guarantor waives any demand by Landlord and/or prior action
      by Landlord of any nature whatsoever against Tenant.

C.    That this Guaranty shall remain and continue in full force and
      effect as to any renewal, extension, modification or amendment of
      said Lease and as to any assignee of Tenant's interest in said
      Lease, and Guarantor waives notice of any and all such renewals,
      extensions, modifications, amendments or assignments.

D.    That Guarantor's obligations hereunder shall remain fully binding
      although Landlord may have waived one or more defaults by Tenant,
      extended the time of performance by Tenant, released, returned or
      misapplied other collateral given later as additional security
      (including other guaranties) or released Tenant from the
      performance of its obligations under such Lease.

E.    That this Guaranty shall remain in full force and effect
      notwithstanding the institution by or against Tenant of
      bankruptcy, reorganization, readjustment, receivership or
      insolvency proceedings of any nature, or the disaffirmance of
      said Lease in any such proceedings or otherwise.

F.    That if this Guaranty is signed by more than one party, their
      obligations shall be joint and several and the release of one of
      such Guarantors shall not release any other of such Guarantors.

G.    That the Guarantor or Guarantors hereby waive all suretyship
      defenses generally, and the right to petition for the marshalling
      of assets.

-1-

H.   That this Guaranty shall be applicable to and inure to the
     benefit of Landlord, its successors and assigns and shall be
     binding upon the heirs, representatives, successors and assigns
     of Guarantor.

I.   That Guarantor hereby waives any and all rights which it may have
     to request a jury trial in any action or proceeding, at law or in
     equity, on any and every matter arising out of or with respect to
     this Guaranty and the Lease.

J.   Notwithstanding the foregoing, Guarantor's liability
     hereunder shall be limited to:  (i) an amount equal to
     twelve (12) months of the applicable Rental due under the
     Lease at the time of Tenant's default plus (ii) the
     unamortized amount of the Allowance (defined in Section 7.1.
     of the Rider) determined by multiplying the total amount of
     the Allowance paid to Tenant by a fraction, the numerator of
     which shall be the number of days from the date of Tenant's
     default through the unexpired Term remaining in the Lease,
     and the denominator of which shall be the full Term of the
     Lease.  In addition, Guarantor shall be liable for all
     costs, fees and expenses of Landlord in connection with the
     collection of this Guaranty.

         IN WITNESS WHEREOF, the undersigned has executed this Guaranty
this 7th day of March

WITNESS:                              THOMAS BROWN, Guarantor


_____              _____


WITNESS:                              STEPHANIE BROWN, Guarantor


_____              Stephanie L. Brown

-2-

LEASE AGREEMENT

by and between

FANEUIL HALL MARKETPLACE, INC.

(Landlord)

and

R & B ENTERPRISES LLC

t/a ZOINKS

(Tenant)

## TABLE OF CONTENTS

PAGE

ARTICLE I   DEFINITIONS AND ATTACHMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Section 1.1.  Certain Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.2.  Additional Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 1.3.  Attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE II   PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Section 2.1.   Demise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE III   TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Section 3.1.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 3.2.  Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 3.3.  Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE IV   USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Section 4.1.  Prompt Occupancy and Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 4.2.  Storage and Office Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 4.3.  Tenant Trade Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 4.4.  Store Hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE V   RENTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Section 5.1.  Rentals Payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 5.2.  Annual Basic Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 5.3.  Annual Percentage Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 5.4.  "Rental Year" Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 5.5.  "Gross Sales" Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 5.6.  Statements of Gross Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 5.7.  Tenant's Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 5.8.  Payment of Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 5.9.  Advance Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 5.10.  Future Expansion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VI   TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Section 6.1.  Tenant to Pay Proportionate Share of Taxes . . . . . . . . . . . . . . . . . . . . . 11
    Section 6.2.  Payment of Proportionate Share of Taxes . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 6.3.  "Tax Year" Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 6.4.  Taxes on Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE VII   IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Section 7.1.  Tenant's Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 7.2.  Effect of Opening for Business . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 7.3.  Mechanic's Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 7.4.  Tenant's Leasehold Improvements and Trade Fixtures . . . . . . . . . . . . . 13

ARTICLE VIII   OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Section 8.1.  Operations by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 8.2.  Signs and Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 8.3.  Painting and Displays by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 8.4.  Trash Removal Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 8.5.  Permitted Use Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Section 8.6.  Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE IX   REPAIRS AND ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Section 9.1.  Repairs To Be Made By Landlord . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 9.2.  Repairs To Be Made By Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 9.3.  Damage to Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 9.4.  Alterations by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 9.5.  Changes and Additions to Shopping Center . . . . . . . . . . . . . . . . . . . 18
    Section 9.6.  Roof and Walls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE X   COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Section 10.1.  Use of Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 10.2.  Management and Operation of Common Areas . . . . . . . . . . . . . . . . . 19
    Section 10.3.  Employee Parking Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 10.4.  Tenant to Share Expense of Common Areas . . . . . . . . . . . . . . . . . . 19
    Section 10.5.  "Landlord's Operating Costs" Defined . . . . . . . . . . . . . . . . . . . . . 20
    Section 10.6.  Mall Heating, Ventilating and Air-Conditioning Equipment
                 Contribution Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 10.7.  Renovation or Expansion of Common Areas . . . . . . . . . . . . . . . . . . 21

ARTICLE XI   MERCHANTS' ASSOCIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Section 11.1.  Merchants' Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 11.2.  Tenant's Contribution to Merchants' Association . . . . . . . . . . . . . . . 22
    Section 11.3.  Landlord's Contribution to Merchants' Association . . . . . . . . . . . . . . 22
    Section 11.4.  "First Association Year" and "Association Year" Defined . . . . . . . . . . 22
    Section 11.5.  Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE XII   UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    Section 12.1.  Water, Electricity, Telephone and Sanitary Sewer . . . . . . . . . . . . . . . 23
    Section 12.2.  Heating, Ventilating and Air-Conditioning . . . . . . . . . . . . . . . . . . . 24
    Section 12.3.  Fire Protection Sprinkler System . . . . . . . . . . . . . . . . . . . . . . . . . 24

Section 12.4.  Discontinuances and Interruptions of Utility Services . . . . . . . . . . . . . 25

ARTICLE XIII   INDEMNITY AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Section 13.1.  Indemnities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Section 13.2.  Landlord Not Responsible for Acts of Others . . . . . . . . . . . . . . . . . 26
Section 13.3.  Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Section 13.4.  Tenant's Contractor's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . 26
Section 13.5.  Policy Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Section 13.6.  Increase in Insurance Premiums . . . . . . . . . . . . . . . . . . . . . . . . . 27
Section 13.7.  Waiver of Right of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Section 13.8.  Tenant to Pay Proportionate Share of Insurance Costs . . . . . . . . . . . . 28

ARTICLE XIV   DAMAGE AND DESTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Section 14.1.  Landlord's Obligation to Repair and Reconstruct . . . . . . . . . . . . . . . 28
Section 14.2.  Landlord's Option to Terminate Lease . . . . . . . . . . . . . . . . . . . . 29
Section 14.3.  Demolition of Landlord's Building . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 14.4.  Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE XV   CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 15.1.  Effect of Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Section 15.2.  Condemnation Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE XVI   ASSIGNMENTS AND SUBLETTING

Section 16.1.  Landlord's Consent Required . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Section 16.2.  Transfer of Corporate Shares . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 16.3.  Transfer of Partnership Interests . . . . . . . . . . . . . . . . . . . . . . . . 32
Section 16.4.  Acceptance of Rent from Transferee . . . . . . . . . . . . . . . . . . . . . . 32
Section 16.5.  Additional Provisions Respecting Transfers . . . . . . . . . . . . . . . . . . 32

ARTICLE XVII   DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Section 17.1.  "Event of Default" Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Section 17.2.  Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Section 17.3.  Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Section 17.4.  Remedies in Event of Bankruptcy or Other Proceeding . . . . . . . . . . . 36

ARTICLE XVIII   SUBORDINATION AND ATTORNMENT . . . . . . . . . . . . . . . . . . . . . 39

Section 18.1.  Subordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Section 18.2.  Mortgagee's Unilateral Subordination . . . . . . . . . . . . . . . . . . . . . 39
Section 18.3.  Attornment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE XIX  NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Section 19.1.  Sending of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 19.2.  Notice to Mortgagees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARTICLE XX  MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Section 20.1.  Radius Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 20.2.  Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 20.3.  Inspections and Access by Landlord . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 20.4.  Memorandum of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 20.5.  Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 20.6.  Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 20.7.  Compliance with Laws and Regulations . . . . . . . . . . . . . . . . . . . . . 42
    Section 20.8.  Captions and Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 20.9.  Joint and Several Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 20.10. Broker's Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 20.11. No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 20.12. No Joint Venture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 20.13. No Option . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 20.14. No Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 20.15. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 20.16. Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 20.17. Corporate Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 20.18. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 20.19. Performance of Landlord's Obligations by Mortgagee . . . . . . . . . . . . . 44
    Section 20.20. Waiver of Certain Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 20.21. Limitation on Right of Recovery Against Landlord . . . . . . . . . . . . . . 44
    Section 20.22. Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 20.23. Relocation of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") dated **MAR 1 4 2002**

by and between FANEUIL HALL MARKETPLACE, INC., a Maryland corporation ("Landlord"), and R & B ENTERPRISES LLC, a Massachusetts limited liability company, t/a ZOINKS, ("Tenant").

## WITNESSETH:

THAT FOR AND IN CONSIDERATION of the sum of One Dollar ($1.00) and the mutual covenants herein contained, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ATTACHMENTS

Section 1.1.    Certain Defined Terms.

As used herein, the term:

A.      "Marketplace Area" (otherwise hereinafter also referred to as "Shopping Center Area") means that certain parcel of land owned, leased or controlled by Landlord situate in the City of Boston, County of Suffolk, Commonwealth of Massachusetts, more particularly described in Schedule "A-1", and upon the opening for business with the public of any expansion of the Markets on any property adjacent to the Marketplace Area (other than the construction or expansion of an Anchor Store on the Property described in Schedule "A-2"), the term Marketplace Area shall include the property used for such expansion.

B.      "Markets" (otherwise hereinafter also referred to as "Shopping Center") means the Marketplace Area and the adjacent parcel or parcels of land more particularly described in Schedule "A-2" , and, upon any expansion of any Anchor Store or the opening of an additional Anchor Store on property adjacent to the Markets, the term "Markets" shall include the property used for such expansion or addition.

C.      "Landlord's Building" means the structures or portions of structures constructed, known as North Market, South Market and Quincy Market Buildings, or to be constructed by Landlord in the Marketplace Area intended to be leased to retail tenants as the same may be altered, reduced, expanded or replaced from time to time.

D.      "Premises" means Tenant's portion of Landlord's Building shown on Schedule "A" having the following area:

Floor Area: 7669 square feet.

E.      "Outside Commencement Date" means July 1, 2002.

"Termination Date" means June 30, 2009.

-1-

F.    "Permitted Use" means the operation of a high quality specialty children's toy store selling at retail an assortment of branded and private label toys, dolls, games, puzzles, children's videos, children's music, arts and crafts, children's dress-up clothing, children's educational CD-ROM/computer games, and children's electronic games, software and books, provided, however, the display area for any one of category of merchandise offered for sale at the Premises shall not exceed fifteen percent (15%) of the sales area of the Premises. Tenant is expressly prohibited from offering for sale at the Premises athletic apparel and/or shoes/footwear of any type or brand.

G.    "Annual Basic Rental" means an amount equal to the product of the following applicable figure multiplied by Tenant's Floor Area (subject to adjustment as provided in Section 5.1.):

| | |
|---|---|
| Rental Years 1 - 4: | $31.00 |
| Rental Years 5 - Termination Date: | $34.00 |

H.    "Annual Percentage Rental" means a sum equal to six percent (6%) of the amount by which annual Gross Sales exceed the product of the following applicable figure multiplied by Tenant's Floor Area (the "Breakpoint"), subject to adjustment as provided in Section 5.1.; provided, however, that in the event during the first or last Rental Year Tenant is not open for business for twelve (12) full months, the Breakpoint shall be an amount equal to the Breakpoint specified herein multiplied by a fraction, the numerator of which shall be the actual number of complete months during which Tenant was open for business during the Rental Year and the denominator of which shall be twelve (12):

| | |
|---|---|
| Rental Years 1 - 4: | $516.67 |
| Rental Years 5 - Termination Date: | $566.67 |

I.    "Security Deposit" means the sum of $0.00. See Rider Section 5.9.

J.    "HVAC Equipment Contribution Rate" means the sum of $0.00. See Schedule F.

K.    "Mall Heating, Ventilating and Air-Conditioning Equipment Contribution Rate" means the sum of $1.00. See Section 10.6.

L.    "Merchants' Association Contribution Rate" means the sum of $5.25. See Article XI.

M.    "Sprinkler Contribution Rate" means the sum of $.25. See Section 12.3.

N.    "Trash Removal Service Charge" . See Section 8.4.

O.    "Water and Sewer Charge" . See Schedule E.

P.    "Tenant Notice Address" means

Mr. Thomas Brown
R & B Enterprises LLC
213 Hanover Street, Suite 4
Boston, MA 02113

-2-

Q.   "Tenant Trade Name" means ZOINKS which Tenant represents it is entitled to use pursuant to all applicable laws.

R.   "Store Hours" means Monday through Saturday 10:00 A.M. to 9:00 P.M. and Sunday 12:00 Noon to 6:00 p.m.

S.   "Restriction Area" means one-half (1/2) mile.

T.   "Landlord's Floor Area" means the aggregate number of square feet of Landlord's leasable floor area in Landlord's Building (exclusive of Anchor Stores) which, with respect to any such floor area which has been leased to any rent-paying tenant, shall be determined in accordance with the provisions of any lease applicable thereto and which, with respect to any such floor area not so leased, shall consist of all such leasable floor area in Landlord's Building designed for the exclusive use and occupancy of rent-paying tenants, which shall exclude Common Areas, storage areas leased separately from retail areas, mezzanine areas and areas used for Landlord's management and promotion offices.

U.   "Tenant's Floor Area" means the number of square feet contained in that portion of Landlord's Floor Area constituting the Premises which shall be measured (a) with respect to the front and rear width thereof, from the exterior face of the adjacent exterior or corridor wall or, if none, from the center of the demising partition, to the opposite exterior face of the adjacent exterior or corridor wall or, if none, to the center of the opposite demising partition, and (b) with respect to the depth thereof, from the front lease line to the exterior face of the rear exterior wall, or corridor wall, or, if neither, to the center of the rear demising partition; and in no case shall there be any deduction for columns or other structural elements within any tenant's premises.

V.   "Common Areas" means those areas and facilities which may be furnished by Landlord or others in or near the Shopping Center Area for the non-exclusive general common use of tenants, Anchor Stores and other occupants of the Shopping Center, their officers, agents, employees and customers, including (without limitation) parking areas, access areas (other than public streets), employee parking areas, truckways, driveways, loading docks and areas, delivery passageways, package pick-up stations, sidewalks, interior and exterior pedestrian walkways and pedestrian bridges, malls, promenades, mezzanines, roofs, sprinklers, plazas, courts, ramps, common seating areas, landscaped and planted areas, retaining walls, balconies, stairways, escalators, elevators, bus stops, first-aid stations, sewage treatment facilities (if any) lighting facilities, comfort stations or rest rooms, civic center, meeting rooms, and other similar areas, facilities or improvements.

W.   "Default Rate" means an annual rate of interest equal to the lesser of (i) the maximum rate of interest for which Tenant may lawfully contract in the State in which the Shopping Center is located, or (ii) eighteen percent (18%).

X.   "Anchor Store" means any department or specialty store which either (i) occupies a floor area in excess of 50,000 square feet in the Shopping Center, or (ii) is designated an Anchor Store in a notice to that effect given by Landlord to Tenant.

Y.   "Landlord's Leased Floor Area" means the monthly average of the aggregate number of square feet contained in those portions of Landlord's Floor Area leased to tenants (including the Premises) as of the first day of each calendar month during the billing period in question, but not less than eighty-five percent (85%) of Landlord's Floor Area.

-3-

Section 1.2.  Additional Defined Terms.

The following additional terms are defined in the places in this Lease noted below:

| Term | Section |
|---|---|
| "Additional Rental" | 5.1 |
| "Annual Merchants' Association Contribution" | 11.2 |
| "Association" | 11.1 |
| "Association Year" | 11.4 |
| "Casualty" | 14.1 |
| "Commencement Date" | 3.1 |
| "Consumer Price Index" | 11.2 |
| "Electricity Component" | Schedule E (if applicable) |
| "Electricity Factor" | Schedule E (if applicable) |
| "Event of Default" | 17.1 |
| "Expansion Opening Contribution" | 11.2 |
| "First Association Year" | 11.4 |
| "Fiscal Year" | Schedule F (if applicable) |
| "Gross Sales" | 5.5 |
| "Hazardous Substance" | 8.6 |
| "HVAC Equipment Contribution" | Schedule F (if applicable) |
| "HVAC Factor" | Schedule F (if applicable) |
| "Landlord's Operating Costs" | 10.5 |
| "Liquidated Damages" | 17.3 |
| "Mortgage" | 18.2 |
| "Mortgagee" | 18.2 |
| "Release" | 8.6 |
| "Rental" | 5.1 |
| "Rental Year" | 5.4 |
| "Taxes" | 6.1 |
| "Tax Year" | 6.3 |
| "Tenant's Electrical Installation" | Schedule E (if applicable) |
| "Tenant's HVAC Charge" | Schedule F (if applicable) |
| "Tenant's V/CW Charge | Schedule F (if applicable) |
| "Term" | 3.1 |
| "Termination Damages" | 17.3 |
| "Umpire" | Schedule E (if applicable) |
| "V/CW Equipment Contribution" | Schedule F (if applicable) |
| "V/CW Factor" | Schedule F (if applicable) |

Section 1.3. Attachments.

The following documents are attached hereto, and such documents, as well as all drawings and documents prepared pursuant thereto, shall be deemed to be a part hereof:

| Schedule "A" | - | Drawing of Shopping Center Area including Landlord's Building and Tenant's Premises |
| Schedule "A-1" | - | Legal Description of Shopping Center |
| Schedule "A-2" | - | Diagram Showing the Markets |
| Schedule "B" | - | None |
| Schedule "C" | - | None |
| Schedule "D" | - | None |
| Schedule "E" | - | Utility Consumption and Payment Schedule |
| . Schedule "F" | - | Tenant Heating, Ventilating and Air-Conditioning Schedule or V/CW Schedule |

Guaranty

## ARTICLE II
## PREMISES

Section 2.1.  Demise.

Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the Premises having the Floor Area as set forth in clause D of Section 1.1. hereof, which Landlord and Tenant hereby conclusively agree represents Tenant's Floor Area for all purposes of this Lease.

Landlord warrants that it and no other person or corporation has the right to lease the Premises hereby demised, and that so long as Tenant is not in default hereunder, Tenant shall have peaceful and quiet use and possession of the Premises, subject to any Mortgage, and all matters of record or other agreements to which this Lease is or may hereafter be subordinated.

Notwithstanding anything to the contrary contained herein, the Premises have been inspected by Tenant who shall be deemed to have accepted the same as existing as of the date Landlord delivers the Premises to Tenant for completion of all work required of it.

## ARTICLE III
## TERM

Section 3.1.  Term.

The term of this Lease (the "Term") shall commence on that date (the "Commencement Date") which shall be the earlier to occur of (a) the Outside Commencement Date or (b) the opening by Tenant of its business in the Premises, and shall terminate on the Termination Date.  Landlord and Tenant agree, upon demand of the other, to execute a declaration setting forth the Commencement Date as soon as the Commencement Date has been determined.

Section 3.2.  Termination.

This Lease shall terminate on the Termination Date, without the necessity of any notice from either Landlord or Tenant to terminate the same, and Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over to the same extent as if statutory notice had been given. Tenant hereby agrees that if it fails to surrender the Premises at the end of the Term, or any renewal thereof, Tenant will be liable to Landlord for any and all damages which Landlord shall suffer by reason thereof, and Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant.  For the period of three (3) months prior to the expiration of the Term, Landlord shall have the right to display on the exterior of the Premises a "For Rent" sign (not to exceed one foot by one foot in size) and during such period Landlord may show the Premises and all parts thereof to prospective tenants during normal business hours.

Section 3.3.  Holding Over.

If Tenant shall be in possession of the Premises after the expiration of the Term, in the absence of any agreement extending the Term, the tenancy under this Lease shall become one from month to month, terminable by either party on thirty (30) days' prior notice, and shall be subject to all of the terms and conditions of this Lease as though the Term had been extended from month to month, except that

-6-

(i) the Annual Basic Rental payable hereunder for each month during said holdover period shall be equal to twice the monthly installment of Annual Basic Rental payable during the last month of the Term, (ii) the installments of Annual Percentage Rental payable hereunder for each such month shall be equal to one-twelfth (1/12th) of the average Annual Percentage Rental payable hereunder for the last three (3) Rental Years of the Term, or if the Term is less than three (3) Rental Years, then such installments shall be equal to one-twelfth (1/12th) of the Annual Percentage Rental payable hereunder for the last complete Rental Year preceding expiration of the Term, and (iii) all Additional Rental payable hereunder shall be prorated for each month during such holdover period.

## ARTICLE IV
### USE

Section 4.1.  Prompt Occupancy and Use.

Tenant shall occupy the Premises upon commencement of the Term and thereafter will continuously use the Premises for the Permitted Use and for no other purpose whatsoever.

Section 4.2.  Storage and Office Areas.

Tenant shall use only such minor portions of the Premises for storage and office purposes as are reasonably required therefor.

Section 4.3.  Tenant Trade Name.

Unless otherwise approved by Landlord, Tenant shall conduct business in the Premises only in the Tenant Trade Name.

Section 4.4.  Store Hours.

Tenant shall cause its business to be conducted and operated in good faith and in such manner as shall assure the transaction of a maximum volume of business in and at the Premises. Tenant covenants and agrees that the Premises shall remain open for business at least during the Store Hours or such other hours as shall be seasonally adjusted by Landlord. If Tenant shall fail to cause its business to be operated during the hours required by the preceding sentence, or as otherwise required by Landlord, in addition to any other remedy available to Landlord under this Lease, Tenant shall pay to Landlord, as liquidated damages for such breach, a sum equal to One Hundred Dollars ($100.00) for each hour or portion thereof during which Tenant shall fail to so operate.

If Tenant shall request Landlord's approval of the opening of the Premises for business for periods exceeding those designated above and Landlord shall approve such request, Tenant shall pay for any additional costs incurred by Landlord in connection with Tenant's opening the Premises for business during such additional hours, including but not limited to, a proportionate share of any additional amounts of Landlord's Operating Costs, additional costs of heating, ventilating and air-conditioning the Premises, and additional utilities furnished to the Premises by Landlord.

## ARTICLE V
## RENTAL

Section 5.1.  Rentals Payable.

Tenant covenants and agrees to pay to Landlord as rental ("Rental") for the Premises, the following:

      (a)    the Annual Basic Rental specified in clause G of Section 1.1; plus

      (b)    the Annual Percentage Rental specified in clause H of Section 1.1; plus

      (c)    all additional sums, charges or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as additional rental (collectively referred to as "Additional Rental");

provided, however, that the Annual Basic Rental and the minimum amount of Gross Sales utilized in the computation of Annual Percentage Rental shall be adjusted proportionately for any Rental Year of more or less than twelve (12) calendar months.

Section 5.2.  Annual Basic Rental.

Annual Basic Rental shall be payable in equal monthly installments in advance on the first day of each full calendar month during the Term, the first such payment to include also any prorated Annual Basic Rental for the period from the date of the commencement of the Term to the first day of the first full calendar month in the Term.

Section 5.3.  Annual Percentage Rental.

Annual Percentage Rental shall be determined and payable monthly on or before the fifteenth (15th) day following the close of each full calendar month during the Term, based on Gross Sales for the preceding calendar month.  Monthly payments of Annual Percentage Rental shall be calculated by (a) dividing the product specified in clause H of Section 1.1. by twelve (12); (b) subtracting the quotient thus obtained from the amount of Gross Sales for the month in question, and (c) multiplying the difference thus obtained (if greater than zero) by the percentage specified in clause H of Section 1.1.  The first monthly payment of Annual Percentage Rental due hereunder shall include prorated Annual Percentage Rental based on Gross Sales from the Commencement Date through the last day of the month immediately prior to the first full calendar month in the Term.  As soon as practicable after the end of each Rental Year, the Annual Percentage Rental paid or payable for such Rental Year shall be adjusted between Landlord and Tenant, and each party hereby agrees to pay to the other, on demand, the amount of any excess or deficiency in Annual Percentage Rental paid by Tenant to Landlord during the preceding Rental Year as may be necessary to effect adjustment to the agreed Annual Percentage Rental.

Section 5.4.  "Rental Year" Defined.

The first "Rental Year" shall commence on the first day of the Term and shall end at the close of the twelfth full calendar month following the commencement of the Term; thereafter each Rental Year shall consist of successive periods of twelve calendar months.  Any portion of the Term remaining at the end of the last full Rental Year shall constitute the final Rental Year and all Rental shall be apportioned therefor.

Section 5.5. "Gross Sales" Defined.

1    "Gross Sales" means the actual sales prices or rentals of all goods, wares and merchandise sold,
2   leased, licensed or delivered and the actual charges for all services performed by Tenant or by any
3   subtenant, licensee or concessionaire in, at, from, or arising out of the use of the Premises, whether for
4   wholesale, retail, cash, credit, trade-in or otherwise, without reserve or deduction for inability or failure
5   to collect. Gross Sales shall include, without limitation, sales and services (a) where the orders therefor
6   originate in, at, from, or arising out of the use of the Premises, whether delivery or performance is made
7   from the Premises or from some other place, (b) made or performed by mail, telephone, or telegraph
8   orders, (c) made or performed by means of mechanical or other vending devices in the Premises, or (d)
9   which Tenant or any subtenant, licensee, concessionaire or other person in the normal and customary
10  course of its business would credit or attribute to its operations in any part of the Premises. Any deposit
11  not refunded shall be included in Gross Sales. Each installment or credit sale shall be treated as a sale
12  for the full price in the month during which such sale is made, regardless of whether or when Tenant
13  receives payment therefor. No franchise, occupancy or capital stock tax and no income or similar tax
14  based on income or profits shall be deducted from Gross Sales.

1    The following shall not be included in Gross Sales: (i) any exchange of merchandise between
2   stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business
3   and not for the purpose of consummating a sale made in, at or from the Premises, or for the purpose of
4   depriving Landlord of the benefit of a sale which would otherwise be made in or at the Premises, (ii)
5   returns to shippers or manufacturers, (iii) cash or credit refunds to customers on transactions (not to
6   exceed the actual selling price of the item returned) otherwise included in Gross Sales, (iv) sales of trade
7   fixtures, machinery and equipment after use thereof in the conduct of Tenant's business, (v) amounts
8   collected and paid by Tenant to any government for any sales or excise tax, and (vi) the amount of any
9   discount on sales to employees.

Section 5.6. Statements of Gross Sales.

1    Tenant shall deliver to Landlord: (a) within ten (10) days after the close of each calendar month
2   of the Term, a written report signed by Tenant or by an authorized officer or agent of Tenant, showing
3   the Gross Sales made in the preceding calendar month and (b) within sixty (60) days after the close of
4   each Rental Year, a statement of Gross Sales for the preceding Rental Year which shall conform to and
5   be in accordance with generally accepted accounting principles and Section 5.5. The annual statement
6   shall be accompanied by the signed certificate of an independent Certified Public Accountant stating
7   specifically that (i) he has examined the report of Gross Sales for the preceding Rental Year, (ii) his
8   examination included such tests of Tenant's books and records as he considered necessary or appropriate
9   under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Rental Year,
10  and (iv) the said Gross Sales conform with and are computed in compliance with the definition of Gross
11  Sales contained in Section 5.5 hereof. If Tenant shall fail to deliver such annual statement and certificate
12  to Landlord within said sixty (60) day period, Landlord shall have the right thereafter to employ an
13  independent Certified Public Accountant to examine such books and records, including without limitation
14  all records required by Section 5.7, as may be necessary to certify the amount of Tenant's Gross Sales
15  for such Rental Year, and Tenant shall pay to Landlord the cost thereof as Additional Rental.

1    If such audit shall disclose that Tenant's records, in the opinion of such independent Certified
2   Public Accountant, are inadequate to disclose such Gross Sales, Landlord shall be entitled to collect, as
3   Additional Rental, an equitable sum determined by such independent Certified Public Accountant but not
4   exceeding fifty percent (50%) of the Annual Basic Rental payable by Tenant during the period in
5   question.

Section 5.7.  Tenant's Records.

For the purpose of permitting verification by Landlord of any amounts due as Rental, Tenant will (i) cause the business upon the Premises to be operated so that a duplicate sales slip, invoice or non-resettable cash register receipt, serially numbered, or such other device for recording sales as Landlord approves, shall be issued with each sale or transaction, whether for cash, credit or exchange, and (ii) preserve for at least three (3) years, and during the Term shall keep at the Tenant Notice Address or the Premises, a general ledger, required receipts and disbursement journals and such sales records and other supporting documentation, together with original or duplicate books and records, which shall disclose all information required to determine Tenant's Gross Sales and which shall conform to and be in accordance with generally accepted accounting principles.  At any time or from time to time after advance notice to Tenant, Landlord or any Mortgagee, their agents and accountants, shall have the right during business hours to make any examination or audit of such books and records which Landlord or such Mortgagee may desire.  If such audit shall disclose a liability in any Rental Year for Rental in excess of the Rental theretofore paid by Tenant for such period, Tenant shall promptly pay such liability.  Should any such liability for Rental equal or exceed three percent (3%) of Annual Percentage Rental previously paid for such Rental Year, or if such audit shall disclose that Tenant has underreported Gross Sales by five percent (5%) or more during any Rental Year, (a) Tenant shall promptly pay the cost of audit and interest at the Default Rate on all additional Annual Percentage Rental then payable, accounting from the date such additional Annual Percentage Rental was due and payable, and (b) an Event of Default shall be deemed to exist unless, within ten (10) days  after Landlord shall have given Tenant notice of such liability, Tenant shall furnish Landlord with evidence satisfactorily demonstrating to Landlord that such liability for additional Annual Percentage Rental was the result of good faith error on Tenant's part.  If such audit shall disclose that Tenant's records, in Landlord's opinion, are inadequate to accurately reflect Tenant's Gross Sales, Landlord shall have the right to retain a consultant to prepare and establish a proper recording system for the determination of Tenant's Gross Sales  and Tenant agrees that it shall use the system, books and records prescribed by such consultant for such purpose. Tenant shall pay to Landlord, as Additional Rental, the fees and expenses of such consultant.

Section 5.8.  Payment of Rental.

Tenant shall pay all Rental when due and payable, without any setoff, deduction or prior demand therefor whatsoever.  Except as provided herein, Tenant shall not pay any Rental earlier than one (1) month in advance of the date on which it is due.  If Tenant shall fail to pay any Rental within seven (7) days after the same is due, Tenant shall be obligated to pay a late payment charge equal to the greater of One Hundred Dollars ($100.00) or ten percent (10%) of any Rental payment not paid when due to reimburse Landlord for its additional administrative costs.  In addition, any Rental which is not paid within seven (7) days after the same is due shall bear interest at the Default Rate from the first day due until paid.  Any Additional Rental which shall become due shall be payable, unless otherwise provided herein, with the next installment of Annual Basic Rental.  Rental and statements required of Tenant shall be paid and delivered to Landlord at the management office of Landlord in the Shopping Center Area during normal business hours, or at such other place as Landlord may from time to time designate in a notice to Tenant.  Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account.  The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such check without prejudice to any other rights or remedies which Landlord may have against Tenant.

-10-

Section 5.9. Advance Rental.

Upon execution of this Lease by Tenant, Tenant shall pay to Landlord the Advance Rental, the same to be held as security for the performance by Tenant of all obligations imposed under this Lease which Tenant is required to perform prior to the commencement of the Term. If Tenant shall faithfully perform all such obligations, then the Advance Rental shall be applied, pro tanto, by Landlord against the Rental first becoming due hereunder. Otherwise, Landlord shall be entitled to apply the Advance Rental, pro tanto, against any damages which it may sustain by reason of Tenant's failure to perform its obligations under this Lease, but such application shall not preclude Landlord from recovering greater damages if the same can be established.

Section 5.10. Future Expansion.

In the event that during the Term (i) additional Anchor Stores are constructed in the Shopping Center, or (ii) one or more expansions of Landlord's Building, each involving the addition of at least 50,000 square feet of Landlord's Floor Area, are constructed, then, upon the opening for business of each such additional Anchor Store or expansion of Landlord's Building, the Annual Basic Rental shall be increased by ten percent (10%) for each such Anchor Store or expansion opening and the Breakpoint shall be increased by a like percentage.

## ARTICLE VI
## TAXES

Section 6.1. Tenant to Pay Proportionate Share of Taxes.

Tenant shall pay in each Tax Year during the Term, as Additional Rental, a proportionate share of all amounts payable by Landlord with respect to real estate taxes, ad valorem taxes and assessments, general and special, taxes on real estate rental receipts, taxes on Landlord's gross receipts, or any other tax imposed upon or levied against real estate, or upon owners of real estate as such rather than persons generally, extraordinary as well as ordinary, foreseeable and unforeseeable, including taxes imposed on leasehold improvements which are assessed against Landlord, payable with respect to or allocable to the Shopping Center Area, including all land, Landlord's Building and all other buildings and improvements situated thereon, together with the reasonable cost (including fees of attorneys, consultants and appraisers) of any negotiation, contest or appeal pursued by Landlord in an effort to reduce any such tax, assessment or charge, and all of Landlord's reasonable administrative costs in relation to the foregoing, all of the above being collectively referred to herein as "Taxes." Tenant's proportionate share of Taxes shall be computed by multiplying the amount of such Taxes (less any contributions by Anchor Stores) by a fraction, the numerator of which shall be Tenant's Floor Area and the denominator of which shall be Landlord's Floor Area. For the Tax Year in which the Term commences or terminates, the provisions of this Section shall apply, but Tenant's liability for its proportionate share of any Taxes for such year shall be subject to a pro rata adjustment based upon the number of days of such Tax Year falling within the Term.

Section 6.2. Payment of Proportionate Share of Taxes.

Tenant's proportionate share of Taxes shall be paid by Tenant in monthly installments in such amounts as are estimated and billed for each Tax Year during the Term by Landlord, each such installment being due on the first day of each calendar month. At any time during a Tax Year, Landlord may reestimate Tenant's proportionate share of Taxes and thereafter adjust Tenant's monthly installments payable during the Tax Year to reflect more accurately Tenant's proportionate share of Taxes. Within

-11-

6   one hundred twenty (120) days after Landlord's receipt of tax bills for each Tax Year, or such reasonable
7   (in Landlord's determination) time thereafter, Landlord will notify Tenant of the amount of Taxes for the
8   Tax Year in question and the amount of Tenant's proportionate share thereof. Any overpayment or
9   deficiency in Tenant's payment of its proportionate share of Taxes for each Tax Year shall be adjusted
10  between Landlord and Tenant, and Landlord and Tenant hereby agree that Tenant shall pay Landlord or
11  Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall
12  pay Tenant), as the case may be, within fifteen (15) days of the aforesaid notice to Tenant, such amounts
13  as may be necessary to effect such adjustment. Failure of Landlord to provide such notice within the time
14  prescribed shall not relieve Tenant of its obligations hereunder. Notwithstanding the foregoing, if
15  Landlord is required under law to pay Taxes in advance, Tenant agrees to pay Landlord, upon
16  commencement of the Term of this Lease, an amount equal to Tenant's share of Taxes for the entire Tax
17  Year in which the Term of this Lease commences, and in such event, at the termination of this Lease,
18  Tenant shall be entitled to a refund of Taxes paid which are attributable to a period after this Lease
19  expires.

### Section 6.3.  "Tax Year" Defined.

1   The term "Tax Year" means each twelve (12) month period (deemed, for the purpose of this
2   Section, to have 365 days) established as the real estate tax year by the taxing authorities having lawful
3   jurisdiction over the Shopping Center Area.

### Section 6.4.  Taxes on Rental.

1   In addition to Tenant's proportionate share of Taxes, Tenant shall pay to the appropriate agency
2   any sales, excise and other taxes (not including, however, Landlord's income taxes) levied, imposed or
3   assessed by the State in which the Shopping Center is situate or any political subdivision thereof or other
4   taxing authority upon any Rental payable hereunder. Tenant shall also pay, prior to the time the same
5   shall become delinquent or payable with penalty, all taxes imposed on its inventory, furniture, trade
6   fixtures, apparatus, equipment, leasehold improvements installed by Tenant or by Landlord on behalf of
7   Tenant (except to the extent such leasehold improvements shall be covered by Taxes referred to in Section
8   6.1), and any other property of Tenant. Landlord may require that Tenant's leasehold improvements be
9   separately assessed by the taxing authority.

### ARTICLE VII
### IMPROVEMENTS

### Section 7.1.  Tenant's Improvements.

1   Tenant agrees, at its sole cost and expense, to remodel the interior and exterior of the Premises
2   in accordance with approved plans and specifications, using new and quality materials and equipment.
3   Plans and specifications for all improvements, including the type of materials to be used by Tenant in the
4   Premises, must be set forth in detail and submitted to Landlord for approval immediately upon execution
5   of this Lease. Tenant agrees to commence remodeling of the Premises promptly upon approval by
6   Landlord of such plans and specifications.  All such remodeling must be completed prior to
7   commencement of the Term.

1   For the purpose of performing its obligations hereunder and for the purpose of installing its
2   fixtures and other equipment, Tenant will be permitted to enter the Premises not less than thirty (30) days
3   prior to the commencement of the Term, on condition that (i) Tenant's activities are conducted in such
4   a manner so as not to unreasonably interfere with Landlord's shopping center activities, and (ii) Tenant

-12-

5    shall, at its own expense, remove from the Premises and from the Shopping Center Area in its entirety
6    all trash which may accumulate in connection with Tenant's activities. It is understood and agreed that
7    during said thirty (30) day period, Tenant shall perform all duties and obligations imposed by this Lease,
8    saving and excepting only the obligation to pay Rental (other than any Additional Rental due Landlord
9    by reason of Tenant's failure to perform any of its obligations hereunder).

### Section 7.2. Effect of Opening for Business.

1    By opening the Premises for business, Tenant shall be deemed to have (a) accepted the Premises,
2    (b) acknowledged that the same are in the condition called for hereunder, and (c) agreed that the
3    obligations of Landlord imposed hereunder have been fully performed.

### Section 7.3. Mechanic's Liens.

1    No work performed by Tenant pursuant to this Lease, whether in the nature of erection,
2    construction, alteration or repair, shall be deemed to be for the immediate use and benefit of Landlord
3    so that no mechanic's or other lien shall be allowed against the estate of Landlord by reason of any
4    consent given by Landlord to Tenant to improve the Premises. Tenant shall place such contractual
5    provisions as Landlord may request in all contracts and subcontracts for Tenant's improvements assuring
6    Landlord that no mechanic's liens will be asserted against Landlord's interest in the Premises or the
7    property of which the Premises are a part. Said contracts and subcontracts shall provide, among other
8    things, the following: That notwithstanding anything in said contracts or subcontracts to the contrary,
9    Tenant's contractors, subcontractors, suppliers and materialmen (hereinafter collectively referred to as
10   "Contractors") will perform the work and/or furnish the required materials on the sole credit of Tenant;
11   that no lien for labor or materials will be filed or claimed by the Contractors against Landlord's interest
12   in the Premises or the property of which the Premises are a part; that the Contractors will immediately
13   discharge any such lien filed by any of the Contractor's suppliers, laborers, materialmen or
14   subcontractors; and that the Contractors will indemnify and save Landlord harmless from any and all
15   costs and expenses, including reasonable attorneys' fees, suffered or incurred as a result of any such lien
16   against Landlord's interest that may be filed or claimed in connection with or arising out of work
17   undertaken by the Contractors. Tenant shall pay promptly all persons furnishing labor or materials with
18   respect to any work performed by Tenant or its Contractors on or about the Premises. If any mechanic's
19   or other liens shall at any time be filed against the Premises or the property of which the Premises are
20   a part by reason of work, labor, services or materials performed or furnished, or alleged to have been
21   performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, and
22   regardless of whether any such lien is asserted against the interest of Landlord or Tenant, Tenant shall
23   forthwith cause the same to be discharged of record or bonded to the satisfaction of Landlord. If Tenant
24   shall fail to cause such lien forthwith to be so discharged or bonded after being notified of the filing
25   thereof, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the
26   same by paying the amount claimed to be due, and the amount so paid by Landlord, including reasonable
27   attorneys' fees incurred by Landlord either in defending against such lien or in procuring the bonding or
28   discharge of such lien, together with interest thereon at the Default Rate, shall be due and payable by
29   Tenant to Landlord as Additional Rental.

### Section 7.4. Tenant's Leasehold Improvements and Trade Fixtures.

1    All leasehold improvements (as distinguished from trade fixtures and apparatus) installed in the
2    Premises at any time, whether by or on behalf of Tenant or by or on behalf of Landlord, shall not be
3    removed from the Premises at any time, unless such removal is consented to in advance by Landlord; and
4    at the expiration of this Lease (either on the Termination Date or upon such earlier termination as

-13-

provided in this Lease), all such leasehold improvements shall be deemed to be part of the Premises, shall not be removed by Tenant when it vacates the Premises, and title thereto shall vest solely in Landlord without payment of any nature to Tenant.

All trade fixtures and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term; provided Tenant shall not at such time be in default of any terms or covenants of this Lease, and provided further, that Tenant shall repair any damage to the Premises caused by the removal of said trade fixtures and apparatus and shall restore the Premises to substantially the same condition as existed prior to the installation of said trade fixtures and apparatus.

To protect Landlord in the event Tenant defaults hereunder, Tenant hereby grants to Landlord a security interest in all goods, inventory, equipment, trade fixtures, and all personal property belonging to Tenant which are or may be put into the Premises during the Term and all proceeds of the foregoing. Said security interest shall secure all amounts to be paid by Tenant to Landlord hereunder, including all costs of collection and other costs specified in Sections 17.2 and 17.3 hereof, and any other indebtedness of Tenant to Landlord. Tenant agrees to sign any financing statement or security agreement requested by Landlord in order to perfect such security interest. The lien granted hereunder shall be in addition to any Landlord's lien that may now or at any time hereafter be provided by law.

## ARTICLE VIII
## OPERATIONS

Section 8.1. Operations by Tenant.

In regard to the use and occupancy of the Premises, Tenant will at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean; (b) keep all exterior store surfaces of the Premises clean; (c) replace promptly any cracked or broken glass of the Premises with glass of like color, grade and quality; (d) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; (e) keep any garbage, trash, rubbish or other refuse in rat-proof containers within the interior of the Premises until removed; (f) deposit such garbage, trash, rubbish and refuse, on a daily basis, in designated receptacles provided by Landlord; (g) keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the Premises; (h) comply with all laws, ordinances, rules and regulations of governmental authorities and all reasonable recommendations of Landlord's casualty insurer(s) and other applicable insurance rating organization now or hereafter in effect; (i) light the show windows of the Premises and exterior signs and turn the same off to the extent required by Landlord; (j) keep in the Premises and maintain in good working order one (1) or more type 2A10BC dry chemical fire extinguisher(s); (k) comply with and observe all rules and regulations established by Landlord from time to time which apply generally to all retail tenants in the Shopping Center Area; (l) maintain sufficient and seasonal inventory and have sufficient number of personnel to maximize sales volume in the Premises; and (m) conduct its business in all respects in a dignified manner in accordance with high standards of store operation consistent with the quality of operation of the Shopping Center Area as determined by Landlord and provide an appropriate mercantile quality comparable with the entire Shopping Center.

In regard to the use and occupancy of the Premises and the Common Areas, Tenant will not: (n) place or maintain any merchandise, signage, trash, refuse or other articles in any vestibule or entry of the Premises, on the footwalks or corridors adjacent thereto or elsewhere on the exterior of the Premises, nor obstruct any driveway, corridor, footwalk, parking area, mall or any other Common Areas; (o) use or permit the use of any objectionable advertising medium such as, without limitation,

6    loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television
7    broadcasts within the Shopping Center, which is in any manner audible or visible outside of the Premises;
8    (p) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the
9    Premises; (q) cause or permit objectionable odors (in Landlord's opinion) to emanate or to be dispelled
10   from the Premises; (r) solicit business in any Common Areas; (s) distribute handbills or other advertising
11   matter in any Common Areas (including placing any of the same in or upon any automobiles parked in
12   the parking areas); (t) permit the parking of vehicles so as to interfere with the use of any driveway,
13   corridor, footwalk, parking area, mall or other Common Areas; (u) receive or ship articles of any kind
14   outside the designated loading areas for the Premises; (v) use the mall, corridor or any other Common
15   Areas adjacent to the Premises for the sale or display of any merchandise or for any other business,
16   occupation or undertaking; (w) conduct or permit to be conducted any auction, fictitious fire sale, going
17   out of business sale, bankruptcy sale (unless directed by court order), or other similar type sale in or
18   connected with the Premises (but this provision shall not restrict the absolute freedom of Tenant in
19   determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, promotional or
20   clearance sales); (x) use or permit the use of any portion of the Premises in a manner which will be in
21   violation of law, or for any activity of a type which is not generally considered appropriate for regional
22   shopping centers conducted in accordance with good and generally accepted standards of operation; (y)
23   place a load upon any floor which exceeds the floor load which the floor was designed to carry; (z)
24   operate its heating or air-conditioning in such a manner as to drain heat or air-conditioning from the
25   Common Areas or from the premises of any other tenant or other occupant of the Shopping Center; or
26   (aa) use the Premises for any unlawful or illegal business, use or purpose, or for any business, use or
27   purpose which is immoral or disreputable (including without limitation "adult entertainment
28   establishments" and "adult bookstores"), or which is hazardous, or in such manner as to constitute a
29   nuisance of any kind (public or private), or for any purpose or in any way in violation of the certificates
30   of occupancy (or other similar approvals of applicable governmental authorities).

1    Tenant acknowledges that it is Landlord's intent that the Shopping Center Area be operated in
2    a manner which is consistent with the highest standards of decency and morals prevailing in the
3    community which it serves. Toward that end, Tenant agrees that it will not sell, distribute, display or
4    offer for sale any item which, in Landlord's good faith judgment, is inconsistent with the quality of
5    operation of the Shopping Center Area or may tend to injure or detract from the moral character or image
6    of the Shopping Center Area within such community. Without limiting the generality of the foregoing,
7    Tenant will not sell, distribute, display or offer for sale (i) any roach clip, water pipe, bong, coke spoon,
8    cigarette papers, hypodermic syringe or other paraphernalia commonly used in the use or ingestion of
9    illicit drugs, (ii) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film,
10   picture, recording, representation or merchandise of any kind, or (iii) any handgun.

### Section 8.2.  Signs and Advertising.

1    Tenant will not place or suffer to be placed or maintained on the exterior of the Premises, or any
2    part of the interior visible from the exterior thereof, any sign, banner, advertising matter or any other
3    thing of any kind (including, without limitation, any hand-lettered advertising), and will not place or
4    maintain any decoration, letter or advertising matter on the glass of any window or door of the Premises
5    without first obtaining Landlord's approval. Tenant will, at its sole cost and expense, maintain such sign,
6    banner, decoration, lettering, advertising matter or other thing as may be permitted hereunder in good
7    condition and repair at all times.

### Section 8.3.  Painting and Displays by Tenant.

1    Tenant will not paint or decorate any part of the exterior of the Premises, or any part of the
2    interior of the Premises visible from the exterior thereof, without first obtaining Landlord's approval.

-15-

Tenant will install and maintain at all times, subject to the other provisions of this Section, displays of merchandise in the show windows (if any) of the Premises. All articles, and the arrangement, style, color and general appearance thereof, in the interior of the Premises including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and standards of the improvements within the Shopping Center, as determined by Landlord. Landlord reserves the right to require Tenant to correct any non-conformity.

Section 8.4. Trash Removal Service.

At its option, Landlord may furnish (or authorize others to furnish) a service for the removal of trash from receptacles designated by Landlord for the daily deposit by Tenant of its garbage, trash, rubbish or other refuse, and, if it shall do so, then in each Rental Year, at Landlord's election, Tenant shall either (i) reimburse Landlord monthly, as Additional Rental, for all costs incurred by Landlord in furnishing such service, or (ii) pay Landlord the Trash Removal Service Charge, if any, set forth in clause N of Section 1.1. in twelve (12) equal monthly installments, subject to adjustments reflecting any increase in Landlord's cost and expense in furnishing such trash removal service, or (iii) pay directly such person, firm or corporation authorized by Landlord to provide such trash removal service; provided, however, that all amounts which Tenant is obligated to pay to Landlord pursuant to clause (i) or (ii) above shall not exceed the amounts which Tenant would otherwise be obligated to pay directly to the same independent contractor utilized by Landlord for the removal of Tenant's trash, if Tenant were dealing with such contractor at arm's length for trash removal services for the Premises.

Section 8.5. Permitted Use Disclaimer.

Nothing contained in this Lease shall be construed to indicate any intent or attempt on the part of Landlord to restrict the price or prices at which Tenant may sell any goods or services permitted to be sold at or from the Premises pursuant to this Lease.

Section 8.6. Hazardous Substances.

Tenant shall not use or allow the Premises to be used for the Release, storage, use, treatment, disposal or other handling of any Hazardous Substance, without the prior consent of Landlord. The term "Release" shall have the same meaning as is ascribed to it in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., as amended, ("CERCLA"). The term "Hazardous Substance" means (i) any substance defined as a "hazardous substance" under CERCLA, (ii) petroleum, petroleum products, natural gas, natural gas liquids, liquefied natural gas, and synthetic gas, and (iii) any other substance or material deemed to be hazardous, dangerous, toxic, or a pollutant under any federal, state or local law, code, ordinance or regulation.

Tenant shall: (a) give prior notice to Landlord of any activity or operation to be conducted by Tenant at the Premises which involves the Release, use, handling, generation, treatment, storage, or disposal of any Hazardous Substance ("Tenant's Hazardous Substance Activity"), (b) comply with all federal, state, and local laws, codes, ordinances, regulations, permits and licensing conditions governing the Release, discharge, emission, or disposal of any Hazardous Substance and prescribing methods for or other limitations on storing, handling, or otherwise managing Hazardous Substances, (c) at its own expense, promptly contain and remediate any Release of Hazardous Substances arising from or related to Tenant's Hazardous Substance Activity in the Premises, Landlord's Building, the Shopping Center, the Shopping Center Area or the environment and remediate and pay for any resultant damage to property, persons, and/or the environment, (d) give prompt notice to Landlord, and all appropriate regulatory authorities, of any Release of any Hazardous Substance in the Premises, Landlord's Building,

-16-

12 the Shopping Center, the Shopping Center Area or the environment arising from or related to Tenant's
13 Hazardous Substance Activity, which Release is not made pursuant to and in conformance with the terms
14 of any permit or license duly issued by appropriate governmental authorities, any such notice to include
15 a description of measures taken or proposed to be taken by Tenant to contain and remediate the Release
16 and any resultant damage to property, persons, or the environment, (e) at Landlord's request, which shall
17 not be more frequent than once per calendar year, retain an independent engineer or other qualified
18 consultant or expert acceptable to Landlord, to conduct, at Tenant's expense, an environmental audit of
19 the Premises and immediate surrounding areas, and the scope of work to be performed by such engineer,
20 consultant, or expert shall be approved in advance by Landlord, and all of the engineer's, consultant's,
21 or expert's work·product shall be made available to Landlord, (f) at Landlord's request from time to time,
22 execute affidavits, representations and the like concerning Tenant's best knowledge and belief regarding
23 the presence of Hazardous Substances in the Premises, (g) reimburse to Landlord, upon demand, the
24 reasonable cost of any testing for the purpose of ascertaining if there has been any Release of Hazardous
25 Substances in the Premises, if such testing is required by any governmental agency or Landlord's
26 Mortgagee, (h) upon expiration or termination of this Lease, surrender the Premises to Landlord free
27 from the presence and contamination of any Hazardous Substance.

## ARTICLE IX
## REPAIRS AND ALTERATIONS

### Section 9.1.  Repairs To Be Made By Landlord.

1 Landlord, at its expense, will make, or cause to be made  structural repairs to exterior walls,
2 structural columns, roof penetrations and structural floors which collectively enclose the Premises
3 (excluding, however, all doors, door frames, storefronts, windows and glass); provided Tenant shall give
4 Landlord notice of the necessity for such repairs.

### Section 9.2.   Repairs To Be Made By Tenant.

1 All repairs to the Premises or any installations, equipment or facilities therein, other than those
2 repairs required to be made by Landlord pursuant to Sections 9.1, 12.3 or Section 14.1, shall be made
3 by Tenant at its expense. Without limiting the generality of the foregoing, Tenant will keep the interior
4 of the Premises, together with all electrical, plumbing and other mechanical installations therein and (if
5 and to the extent provided in Schedule F) the heating, ventilating and air-conditioning system installed
6 by Tenant in the Premises, in good order and repair and will make all replacements from time to time
7 required thereto at its expense. Tenant will surrender the Premises at the expiration of the Term or at
8 such other time as it may vacate the Premises in as good condition as when received, excepting
9 depreciation caused by ordinary wear and tear, damage by Casualty, unavoidable accident or Act of God.
10 Tenant will not overload the electrical wiring serving the Premises or within the Premises, and will install
11 at its expense, subject to the provisions of Section 9.4, any additional electrical wiring which may be
12 required in connection with Tenant's apparatus. Any damage or injury sustained by any person because
13 of mechanical, electrical, plumbing or any other equipment or installations, whose maintenance and repair
14 shall be the responsibility of Tenant, shall be paid for by Tenant, and Tenant hereby agrees to indemnify
15 and hold Landlord harmless from and against all claims, actions, damages and liability in connection
16 therewith, including, but not limited to attorneys' and other professional fees, and any other cost which
17 Landlord might reasonably incur.

### Section 9.3.  Damage to Premises.

1 Tenant will repair promptly at its expense any damage to the Premises and, upon demand, shall
2 reimburse Landlord (as Additional Rental) for the cost of the repair of any damage elsewhere in the

-17-

3    Shopping Center, caused by or arising from the installation or removal of property in or from the
4    Premises, regardless of fault or by whom such damage shall be caused (unless caused by Landlord, its
5    agents, employees or contractors). If Tenant shall fail to commence such repairs within five (5) days
6    after notice to do so from Landlord, Landlord may make or cause the same to be made and Tenant agrees
7    to pay to Landlord promptly upon Landlord's demand, as Additional Rental, the cost thereof with interest
8    thereon at the Default Rate until paid.

### Section 9.4.  Alterations by Tenant.

1    Tenant will not make any alterations, renovations, improvements or other installations in, on or
2    to any part of the Premises (including, without limitation, any alterations of the storefront, signs,
3    structural alterations, or any cutting or drilling into any part of the Premises or any securing of any
4    fixture, apparatus, or equipment of any kind to any part of the Premises) unless and until Tenant shall
5    have caused plans and specifications therefor to have been prepared, at Tenant's expense, by an architect
6    or other duly qualified person and shall have obtained Landlord's approval thereof. If such approval is
7    granted, Tenant shall cause the work described in such plans and specifications to be performed, at its
8    expense, promptly, efficiently, competently and in a good and workmanlike manner by duly qualified and
9    licensed persons or entities, using first grade materials, without interference with or disruption to the
10   operations of tenants or other occupants of the Shopping Center. All such work shall comply with all
11   applicable codes, rules, regulations and ordinances.

### Section 9.5.  Changes and Additions to Shopping Center.

1    Landlord reserves the right at any time and from time to time  to (a) make or permit changes or
2    revisions in the plan for the Shopping Center or the Shopping Center Area including additions to,
3    subtractions from, rearrangements of, alterations of, modifications of, or supplements to, the building
4    areas, walkways, driveways, parking areas, or other Common Areas, (b)  construct improvements in
5    Landlord's Building and the Shopping Center Area and to make alterations thereof or additions thereto
6    and to build additional stories on or in any such building(s) and build adjoining same, including (without
7    limitation) kiosks, pushcarts and other displays in the Common Areas, and (c) make or permit changes
8    or revisions in the Shopping Center or the Shopping Center Area, including additions thereto, and to
9    convey portions of the Shopping Center Area to others for the purpose of constructing thereon other
10   buildings or improvements, including additions thereto and alterations thereof; provided, however, that
11   no such changes, rearrangements or other construction shall reduce the parking areas below the number
12   of parking spaces required by law.

### Section 9.6.  Roof and Walls.

1    Landlord shall have the exclusive right to use all or any part of the roof of the Premises for any
2    purpose; to erect additional stories or other structures over all or any part of the Premises; to erect in
3    connection with the construction thereof temporary scaffolds and other aids to construction on the exterior
4    of the Premises, provided that access to the Premises shall not be denied; and to install, maintain, use,
5    repair and replace within the Premises pipes, ducts, conduits, wires and all other mechanical equipment
6    serving other parts of the Shopping Center Area, the same to be in locations within the Premises as will
7    not unreasonably deny Tenant's use thereof. Landlord may make any use it desires of the side or rear
8    walls of the Premises or other structural elements of the Premises (including, without limitation, free-
9    standing columns and footings for all columns), provided that such use shall not encroach on the interior
10   of the Premises unless (i) all work carried on by Landlord with respect to such encroachment shall be
11   done during hours when the Premises are not open for business and otherwise shall be carried out in such
12   a manner as not to unreasonably interfere with Tenant's operations in the Premises, (ii)  Landlord, at its

13    expense, shall provide any security services to the Premises required by such work, and (iii) Landlord,
14    at its expense, shall repair all damage to the Premises resulting from such work.

## ARTICLE X
## COMMON AREAS

### Section 10.1.  Use of Common Areas.

1    Landlord grants to Tenant and its agents, employees and customers a non-exclusive license to use
2    the Common Areas in common with others during the Term, subject to the exclusive control and
3    management thereof at all times by Landlord or others and subject, further, to the rights of Landlord set
4    forth in Sections 9.5 and 10.2.

### Section 10.2.  Management and Operation of Common Areas.

1    Landlord will operate and maintain, or will cause to be operated and maintained, the Common
2    Areas in a manner deemed by Landlord to be reasonable and appropriate and in the best interests of the
3    Shopping Center.  Landlord will have the right (i) to establish, modify and enforce reasonable rules and
4    regulations with respect to the Common Areas; (ii) to enter into, modify and terminate easement and
5    other agreements pertaining to the use and maintenance of the Common Areas; (iii) to enforce parking
6    charges (by operation of meters or otherwise) with appropriate provisions for free parking ticket
7    validation by tenants; (iv) to close all or any portion of the Common Areas to such extent as may, in the
8    opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any
9    person or to the public therein; (v) to close temporarily any or all portions of the Common Areas; (vi)
10   to discourage non-customer parking; and (vii) to do and perform such other acts in and to said areas and
11   improvements as, in the exercise of good business judgment, Landlord shall determine to be advisable.

### Section 10.3.  Employee Parking Areas.

1    Tenant and its employees shall park their cars only in such areas designated for that purpose by
2    Landlord.  Upon request by Landlord, Tenant shall furnish Landlord with State automobile license
3    numbers assigned to Tenant's car or cars and cars used by its employees and shall thereafter notify
4    Landlord of any changes in such information within five (5) days after such changes occur.  If Tenant
5    or its employees shall fail to park their cars in the designated parking areas, then, without limiting any
6    other remedy which Landlord may pursue in the event of Tenant's default, Landlord, after giving notice
7    to Tenant, shall have the right to charge Tenant, as Additional Rental, the sum of Ten Dollars ($10.00)
8    per day per car parked in violation of the provisions of this Section.  Tenant shall notify its employees
9    in writing of the provisions of this Section.

### Section 10.4.  Tenant to Share Expense of Common Areas.

1    Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's Operating
2    Costs which shall be computed by multiplying Landlord's Operating Costs (less any contribution to such
3    costs and expenses made by the owner or operator of any Anchor Store in the Shopping Center) by a
4    fraction, the numerator of which is Tenant's Floor Area and the denominator of which is Landlord's
5    Leased Floor Area.  Such proportionate share shall be paid by Tenant in monthly installments in such
6    amounts as are estimated and billed by Landlord at the beginning of each twelve (12) month period
7    commencing and ending on dates designated by Landlord, each installment being due on the first day of

-19-

8 each calendar month. At any time during any such twelve (12) month period, Landlord may reestimate
9 Tenant's proportionate share of Landlord's Operating Costs and thereafter adjust Tenant's monthly
10 installments payable during such twelve (12) month period to reflect more accurately Tenant's
11 proportionate share of Landlord's Operating Costs. Within one hundred twenty (120) days (or such
12 additional time thereafter as is reasonable under the circumstances) after the end of each such twelve (12)
13 month period, Landlord shall deliver to Tenant a statement of Landlord's Operating Costs for such twelve
14 (12) month period and the monthly installments paid or payable shall be adjusted between Landlord and
15 Tenant, and Tenant shall pay Landlord or Landlord shall credit Tenant's account (or, if such adjustment
16 is at the end of the Term, Landlord shall pay Tenant), as the case may be, within fifteen (15) days of
17 receipt of such statement, such amounts as may be necessary to effect such adjustment. Upon reasonable
18 notice, Landlord shall make available for Tenant's inspection (which inspection shall be at Tenant's sole
19 cost and expense) at Landlord's office, during normal business hours, Landlord's records relating to
20 Landlord's Operating Costs for such preceding twelve (12) month period. Failure of Landlord to provide
21 the statement called for hereunder within the time prescribed shall not relieve Tenant from its obligations
22 hereunder.

## Section 10.5.  "Landlord's Operating Costs" Defined.

1 The term "Landlord's Operating Costs" means all costs and expenses incurred by or on behalf
2 of Landlord in operating, managing, insuring, securing and maintaining the Common Areas pursuant to
3 Section 10.2. "Landlord's Operating Costs" includes, but is not limited to, all costs and expenses of
4 operating, maintaining, repairing, lighting, signing, cleaning, painting, striping, policing and security of
5 the Common Areas (including the cost of uniforms, equipment and employment taxes); alarm and life
6 safety systems; insurance, including, without limitation, liability insurance for personal injury, death and
7 property damage, all-risks casualty insurance (including coverage against fire, flood, theft or other
8 casualties), worker's compensation insurance or similar insurance covering personnel, fidelity bonds for
9 personnel, insurance against liability for assault and battery, defamation and claims of false arrest
10 occurring on and about the Common Areas, plate glass insurance for glass exclusively serving the
11 Common Areas; the costs and expenses of maintenance of all exterior glass; maintenance of sprinkler
12 systems; removal of water, snow, ice, trash and debris; regulation of traffic; surcharges levied upon or
13 assessed against parking spaces or areas by governmental or quasi-governmental authorities, payments
14 toward mass transit or car pooling facilities or otherwise as required by governmental or quasi-
15 governmental authorities; costs and expenses in connection with maintaining federal, state or local
16 governmental ambient air and environmental standards; the cost of all materials, supplies and services
17 purchased or hired therefor; operation of public toilets; installing and renting of signs; fire protection;
18 maintenance, repair and replacement of utility systems serving the Common Areas, including, but not
19 limited to, water, sanitary sewer and storm water lines and other utility lines, pipes and conduits; costs
20 and expenses of maintaining and operating sewage treatment facilities, if any; costs and expenses of
21 inspecting and depreciation of machinery and equipment used in the operation and maintenance of the
22 Common Areas and personal property taxes and other charges (including, but not limited to, financing,
23 leasing or rental costs) incurred in connection with such equipment; costs and expenses of the
24 coordination and use of truck docks and loading facilities; costs and expenses of repair or replacement
25 of awnings, paving, curbs, walkways, landscaping, drainage, pipes, ducts, conduits and similar items,
26 plate glass, lighting facilities, floor coverings, and the roof; costs and expenses of planting, replanting,
27 replacing and displaying flowers, shrubbery and planters; costs and expenses incurred in the purchase or
28 rental of music program services and loudspeaker systems, including furnishing electricity therefor; costs
29 of providing light and power to the Common Areas; costs of providing energy to heat, ventilate and air-
30 condition the Common Areas and the operation, maintenance, and repair of equipment required therefor
31 (including, without limitation, the costs of energy management systems serving the Shopping Center
32 Area); cost of water services, if any, furnished by Landlord for the non-exclusive use of all tenants;
33 parcel pick-up and delivery services; and administrative costs attributable to the Common Areas for on-

34 site personnel and an overhead cost equal to fifteen percent (15%) of the total costs and expenses of
35 operating and maintaining the Common Areas. Landlord may elect to amortize any of the foregoing costs
36 and expenses over a useful life determined in accordance with generally accepted accounting principles.

### Section 10.6.  Mall Heating, Ventilating and Air-Conditioning Equipment Contribution Rate.

1 In each Rental Year, Tenant shall pay Landlord annually (in twelve (12) equal monthly
2 installments together with the Annual Basic Rental), as Additional Rental, an amount (the "Mall Heating,
3 Ventilating and Air-Conditioning Equipment Contribution") determined by multiplying the Mall Heating,
4 Ventilating and Air-Conditioning Equipment Contribution Rate by Tenant's Floor Area.

### Section 10.7.  Renovation or Expansion of Common Areas.

1 If, during the Term, the Common Areas, or any part thereof, are expanded or renovated to the
2 extent that Landlord's Improvement Costs incurred in connection therewith exceed a sum equal to Twenty
3 Dollars ($20.00) per square foot of Landlord's Floor Area, the Annual Basic Rental and the dollar
4 amount set forth in clause H of Section 1.1 each shall be increased by ten percent (10%) thereof for each
5 such expansion or renovation effective as of the date on which Landlord delivers to Tenant a notice that
6 Landlord has incurred such costs. The term "Landlord's Improvement Costs" means all direct and
7 indirect costs and expenses incurred by Landlord and properly allocated to the construction and
8 development of capital improvements to the Common Areas, but not including any cost or expense
9 included in Landlord's Operating Costs. Upon reasonable notice, Landlord shall make available for
10 Tenant's inspection (which inspection shall be at Tenant's sole cost and expense) at Landlord's office,
11 during normal business hours, Landlord's records relating to Landlord's Improvement Costs as to which
12 any such notice shall have been delivered.

### ARTICLE XI
### MERCHANTS' ASSOCIATION

### Section 11.1.  Merchants' Association.

1 Tenant agrees to maintain a membership in any merchants' association, if and when established
2 by Landlord (the "Association"), and for the purpose of creating and maintaining a fund for the general
3 promotion and welfare of the Shopping Center as a whole, agrees to pay to the Association or its agent
4 the amounts specified in Section 11.2 regardless of whether Tenant shall remain a member of the
5 Association during the Term. Notwithstanding anything to the contrary which may be contained in this
6 Lease, or in any Article of Incorporation, Corporate Charter or By-Laws of the Association, Tenant
7 covenants and agrees that Landlord may in its sole discretion elect to provide the Association with any
8 or all of the following, and Tenant further expressly authorizes the Association to reimburse Landlord
9 for providing: (i) the services of a marketing manager and all staff deemed necessary by Landlord to
10 carry out effectively the promotion and public relations objectives of the Association; (ii) such reasonable
11 space as may be necessary to carry out the functions of the marketing manager and his or her staff; and
12 (iii) such office equipment, supplies, telephones and other related costs as may be deemed necessary by
13 Landlord to service fully the marketing manager and his or her staff. The Association may appoint
14 Landlord as its agent for the collection of the Association contributions with the right, joint and several,
15 to collect and enforce on behalf of the Association all debts owing by Tenant to the Association. The
16 Association shall have the benefit of Tenant's obligations under this Article XI and shall be entitled to
17 enforce such obligations directly.

Section 11.2.  Tenant's Contribution to Merchants' Association.

Tenant shall make the following contributions to the Association:

(a)  In the First Association Year Tenant shall pay to the Association on the first day of each calendar month an amount determined by (i) multiplying the Merchants' Association Contribution Rate set forth in Section 1.1.L. by Tenant's Floor Area, and (ii) dividing the product thus obtained by twelve (12).  In each subsequent Association Year, Tenant shall pay to the Association an amount (the "Annual Merchants' Association Contribution") determined by multiplying the Merchants' Association Contribution Rate, adjusted as provided below, by Tenant's Floor Area.  The Annual Merchants' Association Contribution shall be paid by Tenant in twelve (12) equal monthly installments, in advance, on the first day of each calendar month.  The Annual Merchants' Association Contribution shall be adjusted annually, as of the first day of each Association Year during the Term, in the same proportion as the Consumer Price Index for All Urban Consumers (U. S. City Average) published by the Bureau of Labor Statistics of the United States Department of Labor (the "Consumer Price Index") most recently reported as of such adjustment date bears to the Consumer Price Index reported for the first full calendar month of the Term, all such adjustments to be apportioned for fractional years.

If during the Term the Consumer Price Index is changed or discontinued, Landlord shall choose a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means shall be utilized in place of the Consumer Price Index as if it had been originally designated in this Lease.

In addition to the adjustment for the Consumer Price Index, the Annual Merchants' Association Contribution may be increased at any time during the Term by a vote of tenants (exclusive of Anchor Stores and Landlord) occupying more than fifty percent (50%) of Landlord's Floor Area.

(b)  If the Shopping Center shall be expanded by adding floor area equal to more than ten percent (10%) of Landlord's Floor Area contained in the Shopping Center as of the date of this Lease, Tenant shall pay to said Association a one time charge for each such expansion (the "Expansion Opening Contribution") determined by (i) multiplying Tenant's Floor Area by the average rate per square foot of all contributions which tenants in the expansion area shall become obligated pursuant to their respective leases to make to the Association with respect to promotion and advertising of the opening of such expansion for business, and (ii) dividing the product thus obtained by two (2).

Section 11.3.  Landlord's Contribution to Merchants' Association.

Landlord shall contribute to the Association for the First Association Year and for each subsequent Association Year, an amount equal to one-fifth (1/5) of the aggregate contributions made by the other contributors to the Association for each such period.

Section 11.4.  "First Association Year" and "Association Year" Defined.

"First Association Year" means the period commencing on the first day of the Term and terminating on the second succeeding December 31.  "Association Year" means each successive period of twelve (12) months commencing with January 1.

Section 11.5. <u>Advertising</u>.

During each Rental Year, Tenant shall advertise its business at the Premises either (i) by expending an amount equal to a minimum of three percent (3%) of Tenant's annual Gross Sales for such period in recognized regional print or electronic advertising media, or (ii) by participating in twelve (12) cooperative advertising units per year sponsored by the Association. Each advertisement shall specify Tenant's business located at the Premises. If Tenant elects to advertise pursuant to clause (i) hereof, Tenant shall preserve original or duplicate books and records at Tenant's Notice Address which shall disclose all information required to determine Tenant's advertising expenditures. Upon advance notice, Landlord, its agents and accountants, shall have the right to audit such books and records. If the audit discloses noncompliance by Tenant for any Rental Year in question, Tenant, in addition to the remedies contained in this Lease, shall pay to Landlord a sum equal to Landlord's cost of the audit, which sum shall be deemed to be Additional Rental, plus as liquidated damages, a sum equal to the amount by which Tenant's expenditures for advertising as required by clause (i) above shall be less than three percent (3%) of Tenant's annual Gross Sales.

Tenant shall, within ten (10) days after the beginning of each Rental Year, notify Landlord of its election to advertise its business either under clause (i) or (ii) above. If Tenant elects to advertise under clause (ii), Tenant may not withdraw such election until the following Rental Year; however, if Tenant elects clause (i); Tenant shall have the right at any time during the Rental Year to change such election to clause (ii).

## ARTICLE XII
### UTILITIES

Section 12.1. <u>Water, Electricity, Telephone and Sanitary Sewer</u>.

Landlord will provide, or cause to be provided, at points in or near the Premises the facilities necessary to enable Tenant to obtain for the Premises water, electricity, telephone and sanitary sewer service. Schedule E sets forth those utilities for which service shall be provided to the Premises by Landlord, if any, as well as the manner in which charges for their consumption shall be determined and paid by Tenant. Unless otherwise provided in Schedule E, Landlord shall not be responsible for providing any utility service to the Premises, nor for providing meters or other devices for the measurement of utilities supplied to the Premises, and Tenant shall arrange for the furnishing to the Premises of such utility services as it may require, as well as for the installation of all such meters or other devices. Tenant shall be solely responsible for and shall promptly pay, as and when the same become due and payable, all charges for water, sewer, electricity, gas, telephone and any other utility used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm or corporation, including Landlord, supplying the same.

If Schedule E does not provide that Landlord will supply electricity to the Premises, Landlord shall have the option, exercisable at any time and from time to time during the Term, to supply electricity to the Premises. If Landlord shall elect to supply electricity to the Premises, Tenant will purchase its requirements for such service tendered by Landlord, and Tenant will pay Landlord, within ten (10) days after mailing by Landlord to Tenant of statements therefor, at the applicable rates determined by Landlord from time to time which Landlord agrees shall not be in excess of the public utility rates for the same service, if applicable. If Landlord so elects to supply electricity, Tenant shall execute and deliver to

8   Landlord, within ten (10) days after request therefor, any documentation reasonably required by Landlord
9   to effect such change in the method of furnishing of electricity.

1   Landlord, in its sole discretion, shall have the right, from time to time, to alter the method and
2   source of supply to the Premises of electricity or any other utility, and Tenant agrees to execute and
3   deliver to Landlord such documentation as may be required to effect such alteration, provided, however,
4   that Tenant shall not be required to bear any portion of the cost of such alteration or to incur any
5   additional financial obligation as a result of such alteration, other than as provided in Schedule E.

1   Tenant shall not at any time overburden or exceed the capacity of the mains, feeders, ducts,
2   conduits, or other facilities by which such utilities are supplied to, distributed in or serve the Premises.
3   If Tenant desires to install any equipment which shall require additional utility facilities or utility facilities
4   of a greater capacity than the facilities provided by Landlord, such installation shall be subject to
5   Landlord's prior approval of Tenant's plans and specifications therefor. If such installation is approved
6   by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation,
7   Tenant agrees to pay Landlord, on demand, the cost for providing such additional utility facilities or
8   utility facilities of greater capacity.

Section 12.2.   Heating, Ventilating and Air-Conditioning.

1   Schedule F entitled "Tenant Heating, Ventilating and Air-Conditioning" specifies the obligations
2   of Landlord and Tenant (other than those obligations set forth in Article X) regarding the heating,
3   ventilating, and air-conditioning equipment and system serving the Premises or the Shopping Center Area
4   and the energy required to operate the heating, ventilating and air-conditioning equipment serving the
5   Premises. Tenant covenants and agrees to pay to Landlord, as Additional Rental and in the same manner
6   as Annual Basic Rental is payable, all charges as the same may be adjusted from time to time, and as
7   more particularly set forth in said Schedule F.

1   Landlord, in its sole discretion, shall have the right, from time to time, to alter the heating,
2   ventilating and air-conditioning systems and equipment serving the Shopping Center, or any part thereof,
3   and Tenant agrees to execute and deliver to Landlord such documentation as may be required to effect
4   such alteration; provided, however, that Tenant shall not be required to bear any portion of the cost of
5   such alteration or to incur any additional financial obligation as a result of such alteration.

1   Tenant shall not at any time overburden or exceed the capacity of the heating, ventilating and air-
2   conditioning systems and equipment serving the Premises. If Tenant desires any additional equipment
3   or revision of the design of the existing equipment, or if Landlord deems it necessary, because of internal
4   loading causing the temperature in the Premises to exceed the temperature in the Common Areas, to
5   install any additional equipment or revise the design of the existing equipment, such additional equipment
6   or revised design shall be subject to Landlord's prior approval of Tenant's plans and specifications
7   therefor and shall be at Tenant's sole cost and expense. If such additional equipment or revised design
8   is approved by Landlord and if Landlord provides such additional equipment or revised design, Tenant
    agrees to pay Landlord, on demand, the cost for providing such additional equipment or revised design.

Section 12.3.   Fire Protection Sprinkler System.

1   Landlord shall provide, install, repair and maintain, or cause to be provided, installed, repaired
2   and maintained, a fire-protection sprinkler system in the Premises, which system shall remain the property
3   of Landlord. Tenant shall pay Landlord, as Additional Rental, for providing such fire protection

-24-

4   sprinkler system, an annual amount determined by multiplying the Sprinkler Contribution Rate by
5   Tenant's Floor Area, said annual sum to be payable in twelve (12) equal monthly installments, in advance
6   on the first day of each calendar month. Any modifications or additions to the existing sprinkler system,
7   whether required as a result of the improvements to be made to the Premises pursuant to Section 7.1 or
8   requested by Tenant after commencement of the Term, shall be made by Landlord at Tenant's cost and
9   expense (after agreement between Landlord and Tenant on a price for such work) or, at Landlord's
10  election, shall be made by Tenant (at its cost and expense), provided Tenant utilizes a licensed contractor
11  approved by Landlord for such purpose.

### Section 12.4.  Discontinuances and Interruptions of Utility Services.

1   Landlord reserves the right to cut off and discontinue, upon notice to Tenant, furnishing any
2   heating, ventilation, air-conditioning or other utility services furnished by Landlord at any time when
3   Tenant has failed to pay when due any amount (whether as Rental or otherwise) due under this Lease.
4   Landlord shall not be liable for any damages resulting from or arising out of any such discontinuance and
5   the same shall not constitute a termination of this Lease or an eviction of Tenant. Landlord shall not be
6   liable to Tenant in damages or otherwise (i) if any utility shall become unavailable from any public utility
7   company, public authority or any other person or entity (including Landlord) supplying or distributing
8   such utility, or (ii) for any interruption in any utility service (including, without limitation, any heating,
9   ventilation, air-conditioning or sprinkler) caused by the making of any necessary repairs or improvements
10  or by any cause beyond Landlord's reasonable control, and the same shall not constitute a termination
11  of this Lease or an eviction of Tenant.

### ARTICLE XIII
### INDEMNITY AND INSURANCE

### Section 13.1.  Indemnities.

1   To the extent permitted by law, Tenant shall and does hereby indemnify Landlord and agrees to
2   save it harmless and, at Landlord's option, defend it from and against any and all claims, actions,
3   damages, liabilities and expenses (including attorneys' and other professional fees) judgments, settlement
4   payments, and fines paid, incurred or suffered by Landlord in connection with loss of life, personal injury
5   and/or damage to property or the environment suffered by third parties arising from or out of the
6   occupancy or use by Tenant of the Premises or any part thereof or any other part of the Shopping Center,
7   occasioned wholly or in part by any act or omission of Tenant, its officers, agents, contractors,
8   employees or invitees, or arising, directly or indirectly, wholly or in part, from any conduct, activity,
9   act, omission, or operation involving the use, handling, generation, treatment, storage, disposal, other
10  management or Release of any Hazardous Substance in, from or to the Premises, whether or not Tenant
11  may have acted negligently with respect to such Hazardous Substance. Tenant's obligations pursuant to
12  this Section shall survive any termination of this Lease with respect to any act, omission or occurrence
13  which took place prior to such termination.

1   To the extent permitted by law, Landlord shall and does hereby indemnify Tenant and agrees to
2   save it harmless from and against any and all claims, actions, damages, liabilities and expenses (including
3   attorneys' and other professional fees) in connection with loss of life, personal injury and/or damage to
4   property suffered by third parties arising from or out of the use of any portion of the Common Areas by
5   Landlord, occasioned wholly or in part by any act or omission of Landlord, its officers, agents,
6   contractors or employees.

-25-

Section 13.2.  Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Premises or any part of the premises adjacent to or connecting with the Premises or any other part of the Shopping Center, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, or water, gas, sewer or steam pipes. To the maximum extent permitted by law, Tenant agrees to use and occupy the Premises, and to use such other portions of the Shopping Center as Tenant is herein given the right to use, at Tenant's own risk.

Section 13.3.  Tenant's Insurance.

At all times on and after delivery of the Premises to Tenant, Tenant will carry and maintain, at its expense, a non-deductible:

(a)    commercial general liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto, to afford protection with respect to personal injury, death or property damage of not less than Two Million Dollars ($2,000,000) per occurrence combined single limit/Four Million Dollars ($4,000,000) general aggregate (but not less than $2,000,000 per location aggregate); and

(b)    all-risks property and casualty insurance policy, including theft coverage, written at replacement cost value and with replacement cost endorsement, covering all of Tenant's personal property in the Premises (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) and all leasehold improvements installed in the Premises by or on behalf of Tenant; and

(c)    comprehensive boiler and machinery equipment policy, including electrical apparatus, if applicable; and

(d)    if and to the extent required by law, worker's compensation insurance policy, or similar insurance in form and amounts required by law.

Section 13.4.  Tenant's Contractor's Insurance.

Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord, a non-deductible:

(a)    commercial general liability insurance policy, including (but not limited to) contractor's liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, to afford protection, with respect to personal injury,

-26-

5                        death or property damage of not less than Three Million Dollars ($3,000,000)
6                        per occurrence combined single limit/Five Million Dollars ($5,000,000) general
7                        aggregate (but not less than $3,000,000 per location aggregate);

1        (b)    comprehensive automobile liability insurance policy with limits for each
2                 occurrence of not less than One Million Dollars ($1,000,000) with respect to
3                 personal injury or death and Five Hundred Thousand Dollars ($500,000) with
4                 respect to property damage; and

1        (c)    worker's compensation insurance policy or similar insurance in form and
2                 amounts required by law.

### Section 13.5.  Policy Requirements.

1      The company or companies writing any insurance which Tenant is required to carry and maintain
2   or cause to be carried or maintained pursuant to Sections 13.3 and 13.4, as well as the form of such
3   insurance, shall at all times be subject to Landlord's approval and any such company or companies shall
4   be licensed to do business in the State in which the Shopping Center is located.  Commercial general
5   liability and all-risks property and casualty insurance policies evidencing such insurance shall, with
6   respect to commercial general liability policies, name Landlord and/or its designee(s) as additional insured
7   and, with respect to all-risks property and casualty insurance policies, name Landlord and/or its
8   designee(s) as loss payee, shall be primary and non-contributory, and shall also contain a provision by
9   which the insurer agrees that such policy shall not be cancelled, materially changed or not renewed
10  without at least thirty (30) days' advance notice to Landlord, c/o The Rouse Company, 10275 Little
11  Patuxent Parkway, Columbia, Maryland 21044, Attention: Risk Manager, by certified mail, return receipt
12  requested, or to such other party or address as may be designated by Landlord or its designee.  Each such
13  policy, or a certificate thereof, shall be deposited with Landlord by Tenant promptly upon commencement
14  of Tenant's obligation to procure the same.  If Tenant shall fail to perform any of its obligations under
15  Sections 13.3, 13.4 or 13.5, Landlord may perform the same and the cost of same shall be deemed
16  Additional Rental and shall be payable upon Landlord's demand.

### Section 13.6.  Increase in Insurance Premiums.

1      Tenant will not do or suffer to be done, or keep or suffer to be kept, anything in, upon or about
2   the Premises which will violate Landlord's policies of hazard or liability insurance or which will prevent
3   Landlord from procuring such policies in companies acceptable to Landlord.  If anything done, omitted
4   to be done or suffered by Tenant to be kept in, upon or about the Premises shall cause the rate of fire
5   or other insurance on the Premises or on other property of Landlord or of others within the Shopping
6   Center to be increased beyond the minimum rate from time to time applicable to the Premises or to any
7   such property for the use or uses made thereof, Tenant will pay, as Additional Rental, the amount of any
8   such increase upon Landlord's demand.

### Section 13.7.  Waiver of Right of Recovery.

1      Except as provided in Section 8.6, neither Landlord nor Tenant shall be liable to the other or to
2   any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or
3   damage to any building, structure or other tangible property, or any resulting loss of income, or losses
4   under worker's compensation laws and benefits, even though such loss or damage might have been
5   occasioned by the negligence of such party, its agents or employees.  The provisions of this Section 13.7
6   shall not limit the indemnification for liability to third parties pursuant to Section 13.1.

-27-

Section 13.8.  Tenant to Pay Proportionate Share of Insurance Costs.

Tenant will pay Landlord, as Additional Rental, a proportionate share of Landlord's cost of maintaining all insurance with respect to Landlord's Building (other than the Common Areas) including, without limitation, all-risks property and casualty insurance and rent insurance.  Such insurance may be carried at the discretion of Landlord in such amounts and companies as Landlord shall determine.

Tenant's proportionate share of such costs shall be computed by multiplying Landlord's insurance costs by a fraction, the numerator of which shall be Tenant's Floor Area and the denominator of which shall be Landlord's Floor Area.  Such proportionate share shall be paid by Tenant in monthly installments in such amounts as are estimated and billed by Landlord during each twelve (12) month period commencing and ending on dates designated by Landlord, each installment being due on the first day of each calendar month.  At any time during any such twelve (12) month period, Landlord may reestimate Tenant's proportionate share of Landlord's insurance costs and thereafter adjust Tenant's monthly installments payable during such twelve (12) month period to reflect more accurately Tenant's proportionate share of such costs.  Within one hundred twenty (120) days (or such additional time thereafter as is reasonable under the circumstances) after the end of each such twelve (12) month period, Landlord shall deliver to Tenant a statement of such insurance costs for such twelve (12) month period and the installments paid or payable shall be adjusted between Landlord and Tenant, and Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term Landlord shall pay Tenant), as the case may be, within fifteen (15) days of receipt of such statement, such amounts as may be necessary to effect such adjustment.  Upon reasonable notice, Landlord shall make available for Tenant's inspection at Landlord's office, during normal business hours, Landlord's records relating to such insurance costs for such preceding twelve (12) month period.   Failure of Landlord to provide the statement called for hereunder within the time prescribed shall not relieve Tenant of its obligations hereunder.

## ARTICLE XIV
## DAMAGE AND DESTRUCTION

Section 14.1.  Landlord's Obligation to Repair and Reconstruct.

If the Premises shall be damaged by fire, the elements, accident or other casualty (any of such causes being referred to herein as a "Casualty"), but the Premises shall not be thereby rendered wholly or partially untenantable, Landlord shall promptly cause such damage to be repaired and there shall be no abatement of Rental.  If, as the result of Casualty, the Premises shall be rendered wholly or partially untenantable, then, subject to the provisions of Section 14.2, Landlord shall cause such damage to be repaired and all Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be abated proportionately as to the portion of the Premises rendered untenantable during the period of such untenantability, and, in addition, during such period of untenantability, the Breakpoint shall also be proportionately reduced by an amount equal to the amount obtained by multiplying the Breakpoint by a fraction, the numerator of which shall be the length of time the Premises are closed and the denominator of which shall be the length of the Rental Year(s) in question.  All such repairs shall be made at the expense of Landlord; provided, however, that Landlord shall not be liable for interruption to Tenant's business or for damage to or replacement or repair of Tenant's personal property (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) or to any leasehold

-28-

16  improvements installed in the Premises by or on behalf of Tenant, all of which damage, replacement or
17  repair shall be undertaken and completed by Tenant promptly.

### Section 14.2.  Landlord's Option to Terminate Lease.

1   If the Premises are (a) rendered wholly untenantable, or (b) damaged as a result of any cause
2   which is not covered by Landlord's insurance or (c) damaged or destroyed in whole or in part during the
3   last three (3) years of the Term, or if Landlord's Building is damaged to the extent of fifty percent (50%)
4   or more of Landlord's Floor Area, then, in any of such events, Landlord may elect to terminate this
5   Lease by giving to Tenant notice of such election within ninety (90) days after the occurrence of such
6   event. If such notice is given, the rights and obligations of the parties shall cease as of the date of such
7   notice, and Rental (other than any Additional Rental due Landlord by reason of Tenant's failure to
8   perform any of its obligations hereunder) shall be adjusted as of the date of such termination.

### Section 14.3.  Demolition of Landlord's Building.

1   If Landlord's Building shall be so substantially damaged that it is reasonably necessary, in
2   Landlord's sole judgment, to demolish same for the purpose of reconstruction, Landlord may demolish
3   the same, in which event the Rental shall be abated to the same extent as if the Premises were rendered
4   untenantable by a Casualty.

### Section 14.4.  Insurance Proceeds.

1   If Landlord does not elect to terminate this Lease pursuant to Section 14.2, Landlord shall,
2   subject to the prior rights of any Mortgagee, disburse and apply any insurance proceeds received by
3   Landlord to the restoration and rebuilding of Landlord's Building in accordance with Section 14.1 hereof.
4   All insurance proceeds payable with respect to the Premises (excluding proceeds payable to Tenant
5   pursuant to Section 13.3) shall belong to and shall be payable to Landlord.

### ARTICLE XV
### CONDEMNATION

### Section 15.1.  Effect of Taking.

1   If the whole or any part of the Premises shall be taken under the power of eminent domain, this
2   Lease shall terminate as to the part so taken on the date Tenant is required to yield possession thereof to
3   the condemning authority. Landlord shall make, or cause to be made, such repairs and alterations as may
4   be necessary in order to restore the part not taken to useful condition and all Rental (other than any
5   Additional Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder)
6   shall be reduced in the same proportion as the portion of the floor area of the Premises so taken bears
7   to Tenant's Floor Area. If the aforementioned taking renders the remainder of the Premises unsuitable
8   for the Permitted Use, either party may terminate this Lease as of the date when Tenant is required to
9   yield possession by giving notice to that effect within thirty (30) days after such date. If twenty percent
10  (20%) or more of Landlord's Floor Area is taken as aforesaid, or if parking spaces in the Shopping
11  Center are so taken thereby reducing the number of parking spaces to less than the number required by
12  law and Landlord does not deem it reasonably feasible to replace such parking spaces with other parking
13  spaces on the portion of the Shopping Center not taken, then Landlord may elect to terminate this Lease

14 as of the date on which possession thereof is required to be yielded to the condemning authority, by
15 giving notice of such election within ninety (90) days after such date. If any notice of termination is
16 given pursuant to this Section, this Lease and the rights and obligations of the parties hereunder shall
17 cease as of the date of such notice and Rental (other than any Additional Rental due Landlord by reason
18 of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as of the date of such
19 termination.

### Section 15.2. Condemnation Awards.

1 All compensation awarded for any taking of the Premises, Landlord's Building, the Shopping
2 Center Area, or any interest in any of the same, shall belong to and be the property of Landlord, Tenant
3 hereby assigning to Landlord all rights with respect thereto; provided, however, nothing contained herein
4 shall prevent Tenant from applying for reimbursement from the condemning authority (if permitted by
5 law) for moving expenses, or the expense of removal of Tenant's trade fixtures, or loss of Tenant's
6 business good will, but only if such action shall not reduce the amount of the award or other
7 compensation otherwise recoverable from the condemning authority by Landlord or the owner of the fee
8 simple estate in the Shopping Center Area.

## ARTICLE XVI
## ASSIGNMENTS AND SUBLETTING

### Section 16.1. Landlord's Consent Required.

1 (a) Except as provided in Section 17.4 with respect to assignment of this Lease following
2 Tenant's bankruptcy, Tenant will not assign this Lease, in whole or in part, nor sublet all or any part of
3 the Premises, nor license concessions or lease departments therein, nor pledge or encumber by mortgage
4 or other instruments its interest in this Lease (each individually and collectively referred to in this Section
5 as a "transfer") without first obtaining the consent of Landlord, which consent Landlord may withhold
6 in its sole and absolute discretion. This prohibition includes, without limitation, any subletting or
7 assignment which would otherwise occur by operation of law, merger, consolidation, reorganization,
8 transfer or other change of Tenant's corporate, partnership or proprietary structure. Any transfer to or
9 by a receiver or trustee in any federal or state bankruptcy, insolvency, or similar proceeding shall be
10 subject to, and in accordance with, the provisions of Section 17.4. Consent by Landlord to any transfer
11 shall not constitute a waiver of the requirement for such consent to any subsequent transfer.

1 (b) Subject to the provisions of Section 17.4 respecting assignment of this Lease following
2 Tenant's bankruptcy and assumption of this Lease by Tenant or its trustee, it is expressly understood and
3 agreed that Landlord may, in its sole and absolute discretion, withhold its consent to any transfer of this
4 Lease or of all or any part of the Premises. The parties recognize that this Lease and the Premises are
5 unique, and that this Lease and the Premises derive value from the remainder of Landlord's Building and
6 the Shopping Center Area as a whole, and that the nature and character of the operations within and
7 management of the Premises are important to the success of Landlord's Building and the Shopping Center
8 Area. Accordingly, and without limiting the generality of the foregoing, Landlord may condition its
9 consent to any transfer upon satisfaction of all or any of the following conditions:

1 (i) the net assets of the assignee, licensee, sublessee or other transferee or permittee
2 (collectively "transferee") immediately prior to the transfer shall not be less than

-30-

the greater of the net assets of Tenant immediately prior to the transfer or the net assets of Tenant at the time of the signing of this Lease;

(ii)    such transfer shall not adversely affect the quality and type of business operation which Tenant has conducted theretofore;

(iii)    such transferee shall possess qualifications for the Tenant business substantially equivalent to those of Tenant and shall have demonstrated recognized experience in successfully operating such a business, including, without limitation, experience in successfully operating a similar quality business in first-class shopping centers;

(iv)    such transferee shall continue to operate the business conducted in the Premises under the same Tenant Trade Name, in the same manner as Tenant and pursuant to all of the provisions of this Lease;

(v)    such transferee shall assume in writing, in a form acceptable to Landlord, all of Tenant's obligations hereunder and Tenant shall provide Landlord with a copy of such assumption/transfer document;

(vi)    Tenant shall pay to Landlord a transfer fee of One Thousand Dollars ($1,000.00) prior to the effective date of the transfer in order to reimburse Landlord for all of its internal costs and expenses incurred with respect to the transfer, including, without limitation, costs incurred in connection with the review of financial materials, meetings with representatives of transferor and/or transferee and preparation, review, approval and execution of the required transfer documentation, and, in addition, Tenant shall reimburse Landlord for any out-of-pocket costs and expenses incurred with respect to such transfer;

(vii)    as of the effective date of the transfer and continuing throughout the remainder of the Term, the Annual Basic Rental shall be the greater of (A) the Annual Basic Rental set forth in Section 1.1.G. hereof, or (B) the sum of all Annual Basic Rental and all Annual Percentage Rental payable by Tenant during the twelve calendar months preceding the transfer;

(viii)    Tenant to which the Premises were initially leased shall continue to remain liable under this Lease for the performance of all terms, including, but not limited to, payment of Rental due under this Lease;

(ix)    Tenant's guarantor, if any, shall continue to remain liable under the terms of the Guaranty of this Lease and, if Landlord deems it necessary, such guarantor shall execute such documents necessary to insure the continuation of its guaranty;

(x)    Landlord shall receive upon execution of its consent the full unamortized amount of any construction or other allowances given to the original Tenant under this Lease, any due but unpaid Rental, and an amount equal to fifteen percent (15%) of any and all consideration paid or agreed to be paid, directly or indirectly, to Tenant for such transfer or for the sale of Tenant's business in connection with which any such transfer is made; and

1          (xi)     each of Landlord's Mortgagees shall have consented in writing to such transfer.

### Section 16.2. Transfer of Corporate Shares.

1          If Tenant is a corporation (other than a corporation the outstanding voting stock of which is listed
2     on a "national securities exchange," as defined in the Securities Exchange Act of 1934) and if at any time
3     after execution of this Lease any part or all of the corporate shares shall be transferred by sale,
4     assignment, bequest, inheritance, operation of law or other disposition (including, but not limited to, such
5     a transfer to or by a receiver or trustee in federal or state bankruptcy, insolvency, or other proceedings)
6     so as to result in a change in the present control of said corporation by the person(s) now owning a
7     majority of said corporate shares, Tenant shall give Landlord notice of such event within fifteen (15) days
8     of the date of such transfer.  If any such transfer is made (and regardless of whether Tenant has given
9     notice of same), Landlord may elect to terminate this Lease at any time thereafter by giving Tenant notice
10    of such election, in which event this Lease and the rights and obligations of the parties hereunder shall
11    cease as of a date set forth in such notice which date shall not be less than sixty (60) days after the date
12    of such notice.  In the event of any such termination, all Rental (other than any Additional Rental due
13    Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be adjusted as
14    of the date of such termination.

### Section 16.3. Transfer of Partnership Interests.

1          If Tenant is a general or limited partnership and if at any time after execution of this Lease any
2     part or all of the interests in the capital or profits of such partnership or any voting or other interests
3     therein shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition
4     (including, but not limited to, such a transfer to or by a receiver or trustee in federal or state bankruptcy,
5     insolvency or other proceedings, and also including, but not limited to, any adjustment in such
6     partnership interests) so as to result in a change in the present control of said partnership by the person
7     or persons now having control of same, Tenant shall give Landlord notice of such event within fifteen
8     (15) days of the date of such transfer.  If any such transfer is made (and regardless of whether Tenant
9     has given notice of same), Landlord may elect to terminate this Lease at any time thereafter by giving
10    Tenant notice of such election, in which event this Lease and the rights and obligations of the parties
11    hereunder shall cease as of a date set forth in such notice which date shall be not less than sixty (60) days
12    after the date of such notice.  In the event of any such termination, all Rental (other than any Additional
13    Rental due Landlord by reason of Tenant's failure to perform any of its obligations hereunder) shall be
14    adjusted as of the date of such termination.

### Section 16.4. Acceptance of Rent from Transferee.

1          The acceptance by Landlord of the payment of Rental following any assignment or other transfer
2     prohibited by this Article shall not be deemed to be a consent by Landlord to any such assignment or
3     other transfer nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.

### Section 16.5. Additional Provisions Respecting Transfers.

1          Without limiting Landlord's right to withhold its consent to any transfer by Tenant, and regardless
2     of whether Landlord shall have consented to any such transfer, neither Tenant nor any other person

having an interest in the possession, use or occupancy of the Premises or any part thereof shall enter into any lease, sublease, license, concession, assignment or other transfer or agreement for possession, use or occupancy of all or any portion of the Premises which provides for rental or other payment for such use, occupancy or utilization based, in whole or in part, on the net income or profits derived by any person or entity from the space so leased, used or occupied, and any such purported lease, sublease, license, concession, assignment or other transfer or agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use or occupancy of all or any part of the Premises. There shall be no deduction from the rental payable under any sublease or other transfer nor from the amount thereof passed on to any person or entity, for any expenses or costs related in any way to the subleasing or transfer of such space.

If Tenant shall make or suffer any such transfer without first obtaining any consent of Landlord required by Section 16.1, any and all amounts received as a result of such transfer shall be the property of Landlord to the extent the same (determined on a square foot basis) is greater than the Annual Basic Rental (on a square foot basis) payable under this Lease, it being the parties' intent that any profit resulting from such transfer shall belong to Landlord, but the same shall not be deemed to be a consent by Landlord to any such transfer or a waiver of any right or remedy of Landlord hereunder.

## ARTICLE XVII
## DEFAULT

Section 17.1. "Event of Default" Defined.

Any one or more of the following events shall constitute an "Event of Default":

(a) The sale of Tenant's interest in the Premises under attachment, execution or similar legal process, or if Tenant is adjudicated as bankrupt or insolvent under any state bankruptcy or insolvency law or an order for relief is entered against Tenant under the Federal Bankruptcy Code and such adjudication or order is not vacated within ten (10) days.

(b) The commencement of a case under any chapter of the Federal Bankruptcy Code by or against Tenant or any guarantor of Tenant's obligations hereunder, or the filing of a voluntary or involuntary petition proposing the adjudication of Tenant or any such guarantor as bankrupt or insolvent, or the reorganization of Tenant or any such guarantor, or an arrangement by Tenant or any such guarantor with its creditors, unless the petition is filed or case commenced by a party other than Tenant or any such guarantor and is withdrawn or dismissed within thirty (30) days after the date of its filing.

(c) The admission in writing by Tenant or any such guarantor of its inability to pay its debts when due;

(d) The appointment of a receiver or trustee for the business or property of Tenant or any such guarantor, unless such appointment shall be vacated within ten (10) days of its entry.

(e)     The making by Tenant or any such guarantor of an assignment for the benefit of its creditors, or if in any other manner Tenant's interest in this Lease shall pass to another by operation of law.

(f)     The failure of Tenant to pay any Rental or other sum of money within seven (7) days after the same is due hereunder.

(g)     Default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within ten (10) days after the giving of notice thereof by Landlord, unless such default is of such nature that it cannot be cured within such ten (10) day period, in which case no Event of Default shall occur so long as Tenant shall commence the curing of the default within such ten (10) day period and shall thereafter diligently prosecute the curing of same; provided, however, if Tenant shall default in the performance of any such covenant or agreement of this Lease two (2) or more times in any twelve (12) month period, then notwithstanding that each of such defaults shall have been cured by Tenant, any further similar default shall be deemed an Event of Default without the ability for cure.

(h)     The vacation or abandonment of the Premises by Tenant at any time following delivery of possession of the Premises to Tenant.

(i)     The occurrence of any other event described as constituting an "Event of Default" elsewhere in this Lease.

Section 17.2.  Remedies.

Upon the occurrence of an Event of Default, Landlord, without notice to Tenant in any instance (except where expressly provided for below or by applicable law) may do any one or more of the following:

(a)     With or without judicial process, enter the Premises and take possession of any and all goods, inventory, equipment, fixtures and all other personal property of Tenant, which is or may be put into the Premises during the Term, whether exempt or not from sale under execution or attachment (it being agreed that said property shall at all times be bound with a lien in favor of Landlord and shall be chargeable for all Rental and for the fulfillment of the other covenants and agreements herein contained), and Landlord may sell all or any part thereof at public or private sale. Tenant agrees that five (5) days prior notice of any public or private sale shall constitute reasonable notice. The proceeds of any such sale shall be applied, first, to the payment of all costs and expenses of conducting the sale or caring for or storing said property (including reasonable attorneys' fees); second, toward the payment of any indebtedness, including (without limitation) indebtedness for Rental, which may be or may become due from Tenant to Landlord; and third, to pay Tenant, on demand, any surplus remaining after all indebtedness of Tenant to Landlord has been fully paid;

(b)     Perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant has failed to perform and of which Landlord shall have given Tenant notice, the cost of which performance by Landlord, together with interest thereon at the Default Rate from the date of such expenditure, shall be deemed Additional Rental and shall be payable by Tenant to Landlord upon demand.  Notwithstanding the provisions of this clause (b) and regardless of whether an Event of Default shall have occurred, Landlord may exercise the remedy described in this clause (b) without any notice to Tenant if Landlord, in its good faith judgment, believes it would be materially injured by failure to take rapid action or if the unperformed obligation of Tenant constitutes an emergency;

(c)     Elect to terminate this Lease and the tenancy created hereby by giving notice of such election to Tenant, and reenter the Premises, without the necessity of legal proceedings, and remove Tenant and all other persons and property from the Premises, and may store such property in a public warehouse or elsewhere at the cost of and for the account of Tenant without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; or

(d)     Exercise any other legal or equitable right or remedy which it may have.

Any costs and expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in enforcing any of its rights or remedies under this Lease shall be deemed to be Additional Rental and shall be repaid to Landlord by Tenant upon demand.

Section 17.3.  Damages.

If this Lease is terminated by Landlord pursuant to Section 17.2., Tenant nevertheless shall remain liable for (a) any Rental and damages which may be due or sustained prior to such termination, all reasonable costs, fees and expenses including, but not limited to, reasonable attorneys' fees, costs and expenses incurred by Landlord in pursuit of its remedies hereunder, or in renting the Premises to others from time to time (all such Rental, damages, costs, fees and expenses being referred to herein as "Termination Damages"), and (b) additional damages (the "Liquidated Damages"), which, at the election of Landlord, shall be either:

(i)     an amount equal to the Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the amount of Rental, if any, which Landlord shall receive during such period from others to whom the Premises may be rented (other than any Additional Rental received by Landlord as a result of any failure of such other person to perform any of its obligations to Landlord), in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of the Lease and continuing until the date on which the Term would have expired but for such termination, and any suit or action brought to collect any such Liquidated Damages for any month shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month by a similar proceeding; or

-35-

(ii)     an amount equal to the present worth (as of the date of such termination) of Rental which, but for termination of this Lease, would have become due during the remainder of the Term, less the fair rental value of the Premises, as determined by an independent real estate appraiser named by Landlord, in which case such Liquidated Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid.  For purposes of this clause (ii), "present worth" shall be computed by discounting such amount to present worth at a discount rate equal to one percentage point above the discount rate then in effect at the Federal Reserve Bank nearest to the location of the Shopping Center.

If such termination shall take place after the expiration of two or more Rental Years, then, for purposes of computing the Liquidated Damages, the Annual Percentage Rental payable with respect to each Rental Year following termination (including the Rental Year in which such termination shall take place) shall be conclusively presumed to be equal to the average Annual Percentage Rental payable with respect to each complete Rental Year preceding termination.  If such termination shall take place before the expiration of two Rental Years, then, for purposes of computing the Liquidated Damages, the Annual Percentage Rental payable with respect to each Rental Year following termination (including the Rental Year in which such termination shall take place) shall be conclusively presumed to be equal to twelve (12) times the average monthly payment of Annual Percentage Rental due prior to such termination, or if no Annual Percentage Rental shall have been payable during such period, then the Annual Percentage Rental for each year of the unexpired Term shall be conclusively presumed to be a sum equal to twenty-five percent (25%) of the Annual Basic Rental due and payable during such unexpired Term.  Termination Damages shall be due and payable immediately upon demand by Landlord following any termination of this Lease pursuant to Section 17.2.  Liquidated Damages shall be due and payable at the times set forth herein.

If this Lease is terminated pursuant to Section 17.2, Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term or terms (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, in its sole discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any rent due upon such reletting.

Nothing contained in this Lease shall limit or prejudice the right of Landlord to prove for and obtain, in proceedings for the termination of this Lease by reason of bankruptcy or insolvency, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.  The failure or refusal of Landlord to relet the Premises or any part or parts thereof shall not release or affect Tenant's liability for damages.

Section 17.4.  <u>Remedies in Event of Bankruptcy or Other Proceeding</u>.

(a)     Anything contained herein to the contrary notwithstanding, if termination of this Lease shall be stayed by order of any court having jurisdiction over any proceeding described in paragraph (b) of Section 17.1., or by federal or state statute, then, following the expiration of any such

stay, or if Tenant or Tenant as debtor-in-possession or the trustee appointed in any such proceeding (being collectively referred to as "Tenant" only for the purposes of this Section 17.4.) shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within fifteen (15) days after entry of the order for relief or as may be allowed by the court, or if Tenant shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on fifteen (15) days' notice to Tenant and upon the expiration of said fifteen (15) day period this Lease shall cease and expire as aforesaid and Tenant shall immediately quit and surrender the Premises as aforesaid.   Upon the termination of this Lease as provided above, Landlord, without notice, may re-enter and repossess the Premises using such force for that purpose as may be necessary without being liable to indictment, prosecution or damages therefor and may dispossess Tenant by summary proceedings or otherwise.

(b) For the purposes of the preceding paragraph (a), adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, shall include, without limitation, the following requirements:

. (i)     that Tenant comply with all of its obligations under this Lease;

(ii)     that Tenant pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate Rental payable for such monthly period;

(iii)    that Tenant continue to use the Premises in the manner originally required by this Lease;

(iv)    that Landlord be permitted to supervise the performance of Tenant's obligations under this Lease;

(v)     that Tenant pay to Landlord within fifteen (15) days after entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, an additional security deposit in an amount acceptable to Landlord;

(vi)    that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease;

(vii)   that if Tenant assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. § 365, or as the same may be amended) to any person who shall have made a bona fide offer to accept an assignment of this Lease on terms

acceptable to such court having competent jurisdiction over Tenant's estate, then notice of such proposed assignment, setting forth (x) the name and address of such person, (y) all of the terms and conditions of such offer, and (z) the adequate assurance to be provided Landlord to assure such person's future performance under this Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. § 365(b)(3), as it may be amended, shall be given to Landlord by Tenant no later than fifteen (15) days after receipt by Tenant of such offer, but in any event no later than thirty (30) days prior to the date that Tenant shall make application to such court for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease; and

(viii)    that if Tenant assumes this Lease and proposes to assign the same, and Landlord does not exercise its option pursuant to paragraph (vii) of this Section 17.4, Tenant hereby agrees that:

(A)    such assignee shall have a net worth not less than the net worth of Tenant as of the Commencement Date, or such Tenant's obligations under this Lease shall be unconditionally guaranteed by a person having a net worth equal to Tenant's net worth as of the Commencement Date;

(B)    such assignee shall not use the Premises except subject to all the restrictions contained in this Lease;

(C)    such assignee shall assume in writing all of the terms, covenants and conditions of this Lease including, without limitation, all of such terms, covenants and conditions respecting the Permitted Use and payment of Rental, and such assignee shall provide Landlord with assurances satisfactory to Landlord that it has the experience in operating stores having the same or substantially similar uses as the Permitted Use, in first-class shopping centers, sufficient to enable it so to comply with the terms, covenants and conditions of this Lease and successfully operate the Premises for the Permitted Use;

(D)    such assignee shall indemnify Landlord against, and pay to Landlord the amount of, any payments which Landlord may be obligated to make to any Mortgagee by virtue of such assignment;

(E)    such assignee shall pay to Landlord an amount equal to the unamortized portion of any construction allowance made to Tenant; and

-38-

(F)   if such assignee makes any payment to Tenant, or for Tenant's account, for the right to assume this Lease (including, without limitation, any lump sum payment, installment payment or payment in the nature of rent over and above the Rental payable under this Lease), Tenant shall pay over to Landlord one-half of any such payment, less any amount paid to Landlord pursuant to clause (E) above on account of any construction allowance.

ARTICLE XVIII
SUBORDINATION AND ATTORNMENT

Section 18.1.  Subordination.

Unless a Mortgagee (as hereinafter defined) shall otherwise elect as provided in Section 18.2, Tenant's rights under this Lease are and shall remain subject and subordinate to the operation and effect of

(a)   any lease of land only or of land and buildings in a sale-leaseback or lease-subleaseback transaction involving the Premises or Landlord's interest therein, or

(b)   any mortgage, deed of trust or other security instrument constituting a lien upon the Premises or Landlord's interest therein,

whether the same shall be in existence at the date hereof or created hereafter, any such lease, mortgage, deed of trust or other security instrument being referred to herein as a "Mortgage", and the party or parties having the benefit of the same, whether as lessor, mortgagee, trustee or noteholder, being referred to herein as a "Mortgagee". Tenant's acknowledgment and agreement of subordination provided for in this Section are self-operative and no further instrument of subordination shall be required; however, Tenant shall execute such further assurances thereof as shall be requisite or as may be requested from time to time by Landlord or any Mortgagee.

Section 18.2.  Mortgagee's Unilateral Subordination.

If a Mortgagee shall so elect by notice to Tenant or by the recording of a unilateral declaration of subordination, this Lease and Tenant's rights hereunder shall be superior and prior in right to the Mortgage of which such Mortgagee has the benefit, with the same force and effect as if this Lease had been executed, delivered and recorded prior to the execution, delivery and recording of such Mortgage, subject, nevertheless, to such conditions as may be set forth in any such notice or declaration.

Section 18.3.  Attornment.

If any person shall succeed to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, and if so requested or required by such successor in interest, Tenant shall attorn to such successor in interest and shall execute such agreement in confirmation of such attornment as such successor in interest shall reasonably request.

-39-

## ARTICLE XIX
## NOTICES

Section 19.1.  Sending of Notices.

Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be deemed to have been given as follows:

      (i)   if intended for Landlord, on the third day following the day on which the same shall have been mailed by United States registered or certified mail or express mail, return receipt requested, with all postage charges prepaid, addressed to Landlord, Attention:  General Counsel, c/o The Rouse Company Building, Columbia, Maryland 21044, with a copy to Landlord's management office in the Shopping Center except that payment of Rental and sales reports shall be delivered to Landlord's management office in the Shopping Center; and

      (ii)  if intended for Tenant, upon the earlier to occur of the following:

          (a)  the third day following the day on which the same shall have been mailed by United States registered or certified mail or express mail, return receipt requested, with all postal charges prepaid, addressed to Tenant at the Tenant Notice Address, or

          (b)  actual receipt at the Tenant Notice Address, and in the event more than one copy of such notice shall have been sent or delivered to Tenant, the first actually received shall control for the purposes of this clause (b).

Either party may, at any time, change its address for the above purposes by sending a notice to the other party stating the change and setting forth the new address.

Section 19.2.  Notice to Mortgagees.

If any Mortgagee shall notify Tenant that it is the holder of a Mortgage affecting the Premises, no notice, request or demand thereafter sent by Tenant to Landlord shall be effective unless and until a copy of the same shall also be sent to such Mortgagee in the manner prescribed in Section 19.1 and to such address as such Mortgagee shall designate.

## ARTICLE XX
## MISCELLANEOUS

Section 20.1.  Radius Restriction.

Tenant agrees that Tenant (and if Tenant is a corporation or partnership, its officers, directors, stockholders, any affiliates or partners) shall not, directly or indirectly, operate, manage or have any interest in any other store or business (unless in operation on the date of this Lease) which is similar to or in competition with the Permitted Use on the commencement date of this Lease and for the Term of this Lease within the Restriction Area. Without limiting any of Landlord's remedies under this Lease,

6  in the event Tenant operates, manages or has any interest in a store or business violating the provisions
7  of this Section, then, at Landlord's option, Landlord may by notice to Tenant require Tenant to include
8  the gross sales of such other store or business in the Gross Sales of the Premises for the purposes of
9  calculating Annual Percentage Rental under this Lease.

Section 20.2.  Estoppel Certificates.

1  At any time and from time to time, within ten (10) days after Landlord shall request the same,
2  Tenant will execute, acknowledge and deliver to Landlord and to such Mortgagee or other party as may
3  be designated by Landlord, a certificate in an acceptable form with respect to the matters required by such
4  party and such other matters relating to this Lease or the status of performance of obligations of the
5  parties hereunder as may be reasonably requested by Landlord.  If Tenant fails to provide such certificate
6  within ten (10) days after request by Landlord, Tenant shall be deemed to have approved the contents of
7  any such certificate submitted to Tenant by Landlord and Landlord is hereby authorized to so certify.

Section 20.3.  Inspections and Access by Landlord.

1  Tenant will permit Landlord, its agents, employees and contractors to enter all parts of the
2  Premises during Tenant's business hours to inspect the same and to enforce or carry out any provision
3  of this Lease, including, without limitation, any access necessary for the making of any repairs which are
4  Landlord's obligation hereunder; provided, however, that, in the event of an emergency, Landlord may
5  enter the Premises for such purposes at any time, upon such notice to Tenant, if any, as shall be feasible
6  under the circumstances.

Section 20.4.  Memorandum of Lease.

1  Neither this Lease nor a short form or memorandum thereof shall be recorded in the public
2  records.

Section 20.5.  Remedies Cumulative.

1  No reference to any specific right or remedy shall preclude Landlord from exercising any other
2  right or from having any other remedy or from maintaining any action to which it may otherwise be
3  entitled at law or in equity.  No failure by Landlord to insist upon the strict performance of any
4  agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a
5  breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall
6  constitute a waiver of any such breach, agreement, term, covenant or condition.  No waiver by Landlord
7  of any breach by Tenant under this Lease or of any breach by any other tenant under any other lease of
8  any portion of the Shopping Center shall affect or alter this Lease in any way whatsoever.

Section 20.6.  Successors and Assigns.

1  This Lease and the covenants and conditions herein contained shall inure to the benefit of and be
2  binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and
3  assigns and shall inure to the benefit of Tenant and only such assigns and subtenants of Tenant to whom
4  the assignment of this Lease or the subletting of the Premises by Tenant has been consented to by
5  Landlord as provided in this Lease.  Upon any sale or other transfer by Landlord of its interest in the

-41-

6  Premises and in this Lease, and the assumption by Landlord's transferee of the obligations of Landlord
7  hereunder, Landlord shall be relieved of any obligations under this Lease accruing thereafter.

Section 20.7. Compliance with Laws and Regulations.

1  Tenant, at its sole cost and expense, shall comply, and shall cause the Premises to comply with
2  (a) all federal, state, regional, county, municipal and other governmental statutes, laws, rules, orders,
3  regulations and ordinances affecting any part of the Premises, or the use thereof, including, but not
4  limited to, those which require the making of any structural, unforeseen or extraordinary changes,
5  whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter
6  enacted involve a change of policy on the part of the governmental body enacting the same, and (b) all
7  rules, orders and regulations of the National Fire Protection Association, Landlord's casualty insurer(s)
8  and other applicable insurance rating organizations or other bodies exercising similar functions in
9  connection with the prevention of fire or the correction of hazardous conditions which apply to the
10 Premises.

Section 20.8. Captions and Headings.

1  The table of contents and the Article and Section captions and headings are for convenience of
2  reference only and in no way shall be used to construe or modify the provisions set forth in this Lease.

Section 20.9. Joint and Several Liability.

1  If two or more individuals, corporations, partnerships or other business associations (or any
2  combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual,
3  corporation, partnership or other business association to pay rent and perform all other obligations
4  hereunder shall be deemed to be joint and several and all notices, payments and agreements given or
5  made by, with or to any one of such individuals, corporations, partnerships or other business associations
6  shall be deemed to have been given or made by, with or to all of them. In like manner, if Tenant shall
7  be a partnership or other business association, the members of which are, by virtue of statute or federal
8  law, subject to personal liability, the liability of each such member shall be joint and several.

Section 20.10. Broker's Commission.

1  Each of the parties represents and warrants that there are no claims for brokerage commissions
2  or finders' fees in connection with the execution of this Lease, and agrees to indemnify the other against,
3  and hold it harmless from, all liability arising from any such claim including, without limitation, the cost
4  of counsel fees in connection therewith.

Section 20.11. No Discrimination.

1  It is Landlord's policy to comply with all applicable state and federal laws prohibiting
2  discrimination in employment based on race, age, color, sex, national origin, disability, religion, or other
3  protected classification. It is further intended that the Shopping Center shall be developed and operated
4  so that all prospective tenants thereof, and all customers, employees, licensees and invitees of all tenants
5  shall have equal opportunity to obtain all the goods, services, accommodations, advantages, facilities and
6  privileges of the Shopping Center without discrimination because of race, age, color, sex, national origin,
7  disability, or religion. To that end, Tenant shall not discriminate in the conduct and operation of its

-42-

8   business in the Premises against any person or group of persons because of the race, age, color, sex,
9   religion, national origin or other protected classification of such person or group of persons.

Section 20.12.  No Joint Venture.

1   Any intention to create a joint venture or partnership relation between the parties hereto is hereby
2   expressly disclaimed.  The provisions of this Lease in regard to the payment by Tenant and the
3   acceptance by Landlord of a percentage of Gross Sales of Tenant and others is a reservation for rent for
4   the use of the Premises.
5
6   Section 20.13.  No Option.
7
8   The submission of this Lease for examination does not constitute a reservation of or option for
9   the Premises, and this Lease shall become effective only upon execution and delivery thereof by both
10  parties.  Execution by signature of an authorized officer of Landlord or any corporate entity acting on
11  behalf of Landlord shall be effective only upon attestation thereof and the affixation of the seal of such
12  corporation by a corporate Secretary or Assistant Secretary of Landlord.

Section 20.14.  No Modification.

1   This writing is intended by the parties as a final expression of their agreement and as a complete
2   and exclusive statement of the terms thereof, all negotiations, considerations and representations between
3   the parties having been incorporated herein.  No course of prior dealings between the parties or their
4   officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any
5   of the terms of this Lease.  Acceptance of, or acquiescence in, a course of performance rendered under
6   this or any prior agreement between the parties or their affiliates shall not be relevant or admissible to
7   determine the meaning of any of the terms of this Lease.  No representations, understandings or
8   agreements have been made or relied upon in the making of this Lease other than those specifically set
9   forth herein.  This Lease can be modified only by a writing signed by the party against whom the
10  modification is enforceable.

Section 20.15.  Severability.

1   If any portion of any term or provision of this Lease, or the application thereof to any person or
2   circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the
3   application of such term or provision to persons or circumstances other than those as to which it is held
4   invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall
5   be valid and be enforced to the fullest extent permitted by law.

Section 20.16.  Third Party Beneficiary.

1   Nothing contained in this Lease shall be construed so as to confer upon any other party the rights
2   of a third party beneficiary except rights contained herein for the benefit of a Mortgagee.

Section 20.17. Corporate Tenants.

If Tenant is a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that: Tenant is a duly constituted corporation qualified to do business in the State in which the Shopping Center is located; all Tenant's franchises and corporate taxes have been paid to date; all future forms, reports, fees and other documents necessary for Tenant to comply with applicable laws will be filed by Tenant when due; and such persons are duly authorized by the board of directors of such corporation to execute and deliver this Lease on behalf of the corporation.

Section 20.18. Applicable Law.

This Lease and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the State in which the Shopping Center is located.

Section 20.19. Performance of Landlord's Obligations by Mortgagee.

Tenant shall accept performance of any of Landlord's obligations hereunder by any Mortgagee of Landlord.

Section 20.20. Waiver of Certain Rights.

Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any action, proceeding or counterclaim (except for those involving personal injury or property damage) arising out of this Lease or Tenant's occupancy of or right to occupy the Premises.

Tenant further agrees that in the event Landlord commences any summary proceeding for non-payment of rent or possession of the Premises, Tenant will not interpose and hereby waives all right to interpose any counterclaim of whatever nature in any such proceeding. Tenant further waives any right to remove said summary proceeding to any other court or to consolidate said summary proceeding with any other action, whether brought prior or subsequent to the summary proceeding.

Section 20.21. Limitation on Right of Recovery Against Landlord.

Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to its interest in the Shopping Center Area and any judgments rendered against Landlord shall be satisfied solely out of the proceeds of sale of its interest in the Shopping Center Area. No personal judgment shall lie against Landlord upon extinguishment of its rights in the Shopping Center Area and any judgment so rendered shall not give rise to any right of execution or levy against Landlord's assets. The provisions hereof shall inure to Landlord's successors and assigns including any Mortgagee.   The foregoing provisions are not intended to relieve Landlord from the performance of any of Landlord's obligations under this Lease, but only to limit the personal liability of Landlord in case of recovery of a judgment against Landlord; nor shall the foregoing be deemed to limit Tenant's rights to obtain injunctive relief or specific performance or to avail itself of any other right or remedy which may be awarded Tenant by law or under this Lease.

If Tenant claims or asserts that Landlord has violated or failed to perform a covenant of Landlord not to unreasonably withhold or delay Landlord's consent or approval, Tenant's sole remedy shall be an

-44-

3  action for specific performance, declaratory judgment or injunction and in no event shall Tenant be
4  entitled to any money damages for a breach of such covenant and in no event shall Tenant claim or assert
5  any claim for any money damages in any action or by way of set off, defense or counterclaim and Tenant
6  hereby specifically waives the right to any money damages or other remedies.

Section 20.22. Survival.

1  All representations, warranties, covenants, conditions and agreements contained herein which
2  either are expressed as surviving the expiration or termination of this Lease or, by their nature, are to
3  be performed or observed, in whole or in part, after the termination or expiration of this Lease, including
4  (without limitation) the obligations of Tenant pursuant to Sections 8.6 and 13.1, shall survive the
5  termination or expiration of this Lease.

Section 20.23. Relocation of Premises.

1  In the event of an expansion, renovation or remerchandising of the Shopping Center in the
2  vicinity of the Premises, Landlord may elect, by giving notice of such election to Tenant, to require
3  Tenant to surrender possession of all or such portion of the Premises and for such period of time
4  (including the remainder of the Term) as Landlord, in its sole discretion, shall deem to be required for
5  such purposes. Such election shall be exercised not more than once during the Term, except that if any
6  such notice of election shall be withdrawn by Landlord, the same shall be deemed not to have been given.
7  Landlord's notice of the exercise of such election shall designate (i) the portion of the Premises required
8  for such purposes, (ii) the period of time during which such surrender shall be required, and (iii) the date
9  by which possession of same shall be surrendered by Tenant, which date shall not be earlier than ninety
10 (90) days after the date on which such notice is given.

1  If Tenant shall be required to surrender possession of all or a portion of the Premises for a period
2  of time which is less than the remainder of the Term, Rental shall abate as to such portion or all of the
3  Premises required to be surrendered, such abatement to be effective beginning as of the date Tenant is
4  required to surrender such possession and continuing until the date on which Landlord redelivers
5  possession to Tenant. For purposes of determining the extent of such abatement of Rental, Tenant's
6  Floor Area hereunder shall be deemed to be reduced during the abatement period by the number of square
7  feet contained in the portion of the Premises of which possession is required to be surrendered.

1  If Tenant shall be required to surrender possession of a portion of the Premises for the entire
2  remainder of the Term, this Lease shall terminate as to such portion as of the date on which Tenant is
3  required to surrender possession thereof to Landlord and all Rental shall be proportionately reduced. For
4  purposes of determining the extent of such reduction of Rental, Tenant's Floor Area hereunder shall be
5  deemed to be reduced as of the date of such termination by the number of square feet contained in the
6  portion of the Premises of which possession is required to be surrendered.

1  If Tenant shall be required to surrender possession of a portion of the Premises, Landlord shall
2  (a) provide any permanent or temporary barriers required by the nature of Landlord's use of such portion,
3  which barriers shall be constructed in such a manner so as to not materially interfere with Tenant's
4  business operations in the Premises; and (b) make such alterations as may be necessary in order to restore
5  the remainder of the Premises to useful condition.

1    If Tenant shall be required to surrender possession of a portion of the Premises and the remainder
2    of the Premises shall be rendered unsuitable for the Permitted Use, or if Tenant shall be required to
3    surrender possession of the entire Premises, Landlord shall have the further right and option to cause
4    Tenant to relocate its business, within ninety (90) days after notice to do so, to another location within
5    the Shopping Center Area, comparable in size and location to the Premises, mutually agreed upon by
6    Landlord and Tenant. Within sixty (60) days after any such notice shall be given, Landlord and Tenant
7    shall execute and deliver an amendment to this Lease which shall substitute a description of the premises
8    to which Tenant is to be relocated for the description of the Premises contained herein and shall modify
9    Tenant's Floor Area accordingly; otherwise all of the terms and conditions of this Lease shall be
10   applicable to Tenant's occupancy of the new premises.

1    If Landlord and Tenant cannot agree on a new location within such sixty (60) days after notice
2    of the exercise by Landlord of its relocation option described in the preceding paragraph, then Landlord
3    may elect to withdraw its notice requiring Tenant to relocate its business, in which event Tenant shall
4    remain in possession of the Premises and this Lease shall remain in full force and effect.  If Landlord
5    shall not elect to withdraw its notice requiring Tenant to relocate its business, the Term shall terminate
6    on the ninetieth (90th) day after such notice, in which event Landlord agrees to pay to Tenant, provided
7    Tenant is not in default under this Lease, and, provided Tenant shall have furnished Landlord with the
8    statement referred to in the last sentence of this paragraph, an amount equivalent to the unamortized value
9    of Tenant's leasehold improvements which were installed in the Premises at Tenant's sole cost and
10   expense.  Said amortization shall be determined on the straight-line depreciation method allowed by the
11   Internal Revenue Code of 1986 (as amended) assuming a depreciation period commencing with the
12   placement in service of such leasehold improvements and ending on the date of expiration of the Term
13   determined pursuant to Section 3.1.  Payment of the amount equivalent to the unamortized value of
14   Tenant's leasehold improvements will be made to Tenant within thirty (30) days after Tenant shall have
15   vacated the Premises in accordance with the terms of this Lease, provided that Landlord shall have the
16   right to deduct therefrom any amounts due Landlord from Tenant pursuant to this Lease.  For purposes
17   of this Section, "Tenant's leasehold improvements" shall include partitioning, electrical wiring, plumbing
18   (other than plumbing fixtures), painting, wallpaper, storefront and other permanent improvements
19   installed, affixed or attached in or to the Premises, but shall not include (x) Tenant's inventory or stock
20   in trade, (y) such trade fixtures, electrical fixtures, equipment or apparatus as are removable by Tenant
21   at the expiration of the Term pursuant to Section 7.4, or (z) Landlord's fixtures or other improvements
22   installed by or at the expense of Landlord.  In order for Tenant to be entitled to payment of the
23   unamortized value of its leasehold improvement as set forth in this paragraph, Tenant shall, within sixty
24   (60) days after commencement of the Term, furnish to Landlord a statement, signed by an independent
25   certified public accountant, setting out in detail the cost of Tenant's leasehold improvements.

1    If this Lease shall be terminated as to any portion or all of the Premises pursuant to this Section,
2    the rights and obligations of the parties hereunder shall cease as of the date specified herein and Rental
3    (other than any Additional Rental due Landlord by reason of Tenant's failure to perform any of its
4    obligations hereunder) shall be adjusted as of the date of such termination. No further documentation
5    shall be required to effect the termination of this Lease, but each party agrees that, upon the request of
6    the other party to do so, it shall execute, acknowledge and deliver an appropriate instrument evidencing
7    such termination prepared by or at the expense of the party requesting the same.

**THIS LEASE AGREEMENT CONTAINS IN SECTION 20.20. A MUTUAL WAIVER BY THE PARTIES OF THE RIGHT TO A JURY TRIAL IN CERTAIN ACTIONS BETWEEN THE PARTIES**

LANDLORD AND TENANT ACKNOWLEDGE THAT CERTAIN SECTIONS OF THIS LEASE HAVE BEEN MODIFIED AND/OR SUPPLEMENTED BY THE RIDER TO LEASE FOUND IMMEDIATELY FOLLOWING THIS SIGNATURE PAGE. WHEREVER THERE IS ANY CONFLICT BETWEEN THE RIDER AND THE LEASE, THE PROVISIONS OF THE RIDER ARE PARAMOUNT AND THE LEASE SHALL BE CONSTRUED ACCORDINGLY.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease as of the day and year first above written.

ATTEST:

FANEUIL HALL MARKETPLACE, INC., Landlord

_____
Assistant Secretary

By: _____
Vice-President

ATTEST:

_____
Secretary

R & B ENTERPRISES LLC, Tenant

By: _____
President

-47-

## RIDER TO LEASE

THIS RIDER is annexed to and forms part of the Lease dated
**MAR 1 4 2002** , between FANEUIL HALL MARKETPLACE, INC.,  a Maryland
corporation as Landlord, and R & B ENTERPRISES LLC, a Massachusetts
limited liability company, t/a ZOINKS, as Tenant.

> The printed part of the Lease is hereby modified
> and supplemented as follows.  Wherever there is
> any conflict between this Rider and the Lease,
> the provisions of this Rider are paramount and
> the Lease shall be construed accordingly.

Section 2.1. (The printed Section deals with Demise):

Add the following to the end of the printed Section 2.1.:

"Upon the election of either Landlord or Tenant, upon delivery of
the Premises to Tenant, but prior to Tenant's installation of its
improvements, the Premises shall be remeasured by Landlord, at the
sole cost and expense of the party requesting such measurement, using
the formula set forth in Section 1.1.U. hereof.  If the total area of
the Premises is found to be less than or greater than the area as set
forth in the printed Section 1.1.D., then Landlord and Tenant shall
execute an amendment to the Lease to correct the discrepancy in the
total area of the Premises, for all purposes of this Lease.  If
neither party requests a remeasurement upon delivery of the Premises
to Tenant, the Floor Area stated in Section 1.1.D. shall be deemed
accepted by the parties hereto for all purposes of this Lease."

Add the following to the end of the printed Section 2.1.:

"It is intended and understood by the parties hereto that this
Lease is both (i) a sublease of the Premises and is subject to a
certain Indenture of Lease (the 'BRA Lease') by and between Landlord
and the Boston Redevelopment Authority (the 'Authority') dated as of
February 21, 1975, and (ii) a sub-sublease of the Premises, and is
subject to a certain lease (the 'City Lease') by and between the City
of Boston (the 'City') as lessor, and the Authority, as lessee, dated
as of February 21, 1975; and all of the foregoing being collectively
referred to herein as the 'Ground Lease'.

"In the event of a termination of the City Lease or the BRA
Lease, or both, Tenant will attorn to the City or the Authority (as
the case may be) and will execute and deliver such instruments as the
party requesting such attornment may require in order to confirm such
attornment."

Section 3.2( (The printed Section deals with Termination):

Add the following to the end of the printed Section 3.2.:

-1-

"Notwithstanding anything contained herein to the contrary, (i) if Tenant's annual Gross Sales for the Rental Year 4 of the Term do not exceed $1,800,000 or (ii) if Tenant's annual Gross Sales for Rental Year 5 or any Rental Year thereafter of the Term do not exceed $2,000,000 [Tenant's annual statement of Gross Sales for Rental Years 4 though the end of the Term shall be certified by an independent Certified Public Accountant for the applicable Rental Year (such certification to be in conformance with the provisions contained in the printed Section 5.6., notwithstanding anything to the contrary which may be contained in this Rider)], Landlord shall have the option to terminate this Lease for each applicable Rental Year stated in subsections (i) and (ii) above by giving advance written notice of its intention to terminate to Tenant within sixty (60) days after Tenant has submitted its annual statement of Gross Sales for the applicable Rental Year to Landlord in accordance with the printed Section 5.6. of this Lease ("Year-End Notice Period"). If Landlord shall exercise its option to terminate in accordance with this Section 3.2., for any of the applicable Rental Years set forth in subsections (i) or (ii) above, this Lease shall terminate as of the end of the Rental Year in which the option is exercised; provided, however Landlord shall have the right at the time it exercises its option to terminate, to notify Tenant of an earlier termination date which shall not be less than sixty (60) days from the date of such notice. If within the Year-End Notice Period, for each applicable Rental Year stated in subsections (i) and (ii) above, Landlord does not notify Tenant of its intention to terminate as provided above, Landlord's option to terminate for that particular Rental Year shall no longer be applicable. In the event the Lease is terminated as provided herein, all Rental and other charges set forth in the Lease shall be apportioned as of the date of termination. Landlord's and Tenant's obligations to indemnify and hold harmless the other party as provided in Section 13.1 of this Lease and the obligations under Section 20.22 shall survive said termination as to any act, omission or occurrence which took place prior to such termination. No further documentation shall be required to effect the termination of this Lease. Either party, however, shall execute, upon reasonable request by the other, additional documentation for the sole purpose of documenting the termination of this Lease."

Section 4.1.   (The printed Section deals with Prompt Occupancy and Use):

Add the following to the end of the printed Section 4.1.:

"Tenant covenants and agrees that it will not devote the Premises or any portion thereof to any use or other activity not specified in or permitted by the Downtown Waterfront-Faneuil Hall Urban Renewal Plan dated April 15, 1964, and recorded at the Suffolk Registry of Deeds in Book 7948, Page 52, as amended by amendments dated April 8, 1965, and December 13, 1973, and as the same may be further amended from time to time."

Section 5.6.   (The printed Section deals with Statements of Gross Sales):

Add the following to the end of the printed Section 5.6.:

-2-

"If Tenant fails to deliver to Landlord its monthly report of Gross Sales by the tenth (10th) day after the close of each calendar month as required pursuant to the provisions of the printed Section 5.6., in addition to any other right or remedy of Landlord under the Lease, Tenant shall pay, as Additional Rental, a late reporting charge equal to Twenty-five Dollars ($25.00) for each day after the date the report was due in which Tenant fails to deliver such report to Landlord; if Tenant fails to deliver to Landlord its annual statement of Gross Sales by the sixtieth (60th) day after the close of each Rental Year as required pursuant to the provisions of the printed Section 5.6., in addition to any other right or remedy of Landlord under the Lease, Tenant shall pay, as Additional Rental, a late reporting charge equal to Twenty-five Dollars ($25.00) for each day after the date the statement was due in which Tenant fails to deliver such statement to Landlord."

Section 5.9. (The printed Section deals with Advance Rental):

Delete the printed Section 5.9. in its entirety.

Section 5.10. (The printed Section deals with Future Expansion):

Delete the printed Section 5.10. in its entirety.

Section 6.1. (The printed Section deals with Tenant to Pay Proportionate Share of Taxes):

Delete the second sentence of the printed Section 6.1 in its entirety and the following in lieu thereof:

"Taxes includes payments in lieu of taxes made to the City of Boston pursuant to a letter agreement dated May 13, 1974 as amended though April 21, 1999 ('Letter Agreement'). Under the Letter Agreement, Landlord certifies to the City Landlord's gross rental income from Retail Tenants, Bull Market Tenants (hereinafter defined) and office tenants at Landlord's Property for a calendar year, and the City calculates the Taxes for the succeeding Tax Year. Tenant's proportionate share of Taxes is calculated by Landlord using as a basis only the tax payments made under the Letter Agreement that are applicable to gross rental income from Retail Tenants (plus allocable costs of administration and appeal as aforesaid) ('Retail Taxes'). Tenant's proportionate share of Taxes for a Tax Year shall be computed by multiplying the amount of Retail Taxes by a fraction (the 'Tenant's Retail Fraction'), the numerator of which shall be Tenant's Floor Area and the denominator of which shall be the total number of square feet in Landlord's Building leased or leasable to Retail Tenants but excluding the outside seating areas.

As used in this Article 6, 'Retail Tenants' means tenants in Landlord's Building which are engaged primarily in selling goods, wares, merchandise or other services to the public generally, but excluding Bull Market Tenants and office tenants or service companies maintaining business offices in the Marketplace Area. 'Bull Market Tenants' means those tenants who operate from pushcarts or portable retail merchandising units.

-3-

If the Taxes payable are changed such that they are no longer based on gross rental income, Landlord shall make such equitable adjustments in the method of calculating the Retail Taxes as Landlord, in its reasonable business judgment, shall deem proper, and Tenant's share of such Retail Taxes shall be calculated by applying the Tenant's Retail Fraction."

Section 6.2. (The printed Section deals with Payment of Proportionate Share of Taxes):

Delete the third sentence of section 6.2 and insert in lieu thereof the following:

"Within one hundred eighty (180) days after the end of each Tax Year, Landlord will notify Tenant of the amount of Retail Taxes for such Tax Year and Tenant's proportionate share of such Retail Taxes. "

Section 7.1. (The printed Section deals with Tenant's Improvements):

Delete the first paragraph of the printed Section 7.1. in its entirety and insert the following in lieu thereof:

"Tenant agrees, at its sole cost and expense, to remodel the interior and exterior of the Premises in accordance with approved plans and specifications, using new and quality materials and equipment (the 'Plans'). The Plans for all improvements, including the type of materials to be utilized by Tenant in the remodeling of the Premises, must be set forth in detail and submitted to Landlord for approval on or before March 1, 2002. Tenant shall complete all remodeling of the Premises prior to July 1, 2002.

"Landlord agrees to reimburse Tenant or at Landlord's sole option to directly pay to the parties contracted an 'Allowance' (as hereinafter defined) for the performance of the following initial remodeling work at the Premises, namely: (a) the preparation of the Plans (defined in the immediately preceding paragraph), provided, however, Landlord's reimbursement to Tenant or its payment to the parties contracted for the preparation of the Plans shall in no event exceed the sum of Twenty Thousand ($20,000.00) ("Plan Allowance") and (b) the completion of the necessary demolition work of the existing improvements in the Premises and the installation, relocation and/or additions needed to the electrical system at the Premises; provided, however, Landlord's reimbursement to Tenant or its payment to the parties contracted for the demolition and electrical work shall not exceed the sum of Thirty Thousand Dollars ($30,000.00) ('Demolition Allowance'). Provided Tenant has complied with all terms and conditions of this Lease, the Plan Allowance and Demolition Allowance (collectively the 'Allowance') will be made, within sixty (60) days after the last to occur of (a) the execution of this Lease by Landlord and Tenant, (b) the date Tenant completes the work required of it under, and in compliance with, this Section 7.1.; (c) the date Tenant opens for business at the Premises; (d) the date Tenant furnishes Landlord with a copy of the receipted bills for the Plans and the demolition and electrical work; provided, however, if Landlord elects to pay the contractors directly Tenant shall furnish Landlord with the invoices for payment of the Plans and the demolition and electrical

-4-

work which invoices shall not exceed the Plan Allowance or the Demolition Allowance, (e) 'releases' or waivers of liens from all parties performing work in the Premises; provided, however, if Landlord elects to pay the contractors directly for the Plans and demolition and electrical work the releases or waivers of liens for those contractors will be obtained by Tenant and delivered to Landlord within thirty (30) days of Landlord's payment to the contractors and (f) an affidavit from Tenant stating that all bills have been paid and that there are no outstanding obligations owed with respect to the work done in the Premises; provided, however, if Landlord elects to pay the contractors directly, Tenant's affidavit shall specifically state those contractors whose invoices were submitted to Landlord for payment.

"Tenant agrees that in the event that the actual documented cost for the Plans and the completion of the demolition and electrical work at the Premises exceeds the amount specified in the immediately preceding paragraph for the Plan Allowance or the Demolition Allowance, Tenant shall pay any such excess amounts to the parties contracted by Landlord or by Tenant, as the case may be, for the preparation of the Plans and/or for the completion of the demolition and electrical work at the Premises.

"Notwithstanding the foregoing, if this Lease shall terminate, or if this Lease is assigned, conveyed or is in any way transferred for any reason to another entity prior to Landlord's payment to Tenant of the Allowance, then, and in such event, the Allowance shall be automatically canceled and withdrawn by Landlord with respect to any future payments or credit of the Allowance.

"In the event Landlord has made payment of the Allowance to Tenant and this Lease subsequently terminates prior to the end of the Term or this Lease is assigned, conveyed or transferred to another entity, said Allowance shall be repaid by Tenant to Landlord. If such event occurs (a) within two (2) years from the Commencement Date, Tenant shall be required to repay to Landlord, upon demand, the full amount of the Allowance received (whether by cash or credit) by Tenant as and for its Allowance; or (b) after two (2) years from the Commencement Date, Tenant shall be required to repay Landlord, upon demand, the amount of the Allowance determined by multiplying the total amount of the Allowance paid to Tenant by a fraction, the numerator of which shall be the amount of the unexpired Term remaining in the Lease, and the denominator of which shall be the full Term of the Lease. Nothing herein contained shall be construed to waive Landlord's rights with regard to Sections 16.1. and 16.2. of this Lease."

Section 8.1. (The printed Section deals with Operations by Tenant):

Add the following to the end of the printed Section 8.1.:

"Quality Control.

"For the purpose of maintaining a uniform and consistent quality of merchandise and merchandising and for the mutual protection of all

-5-

tenants of the Marketplace Area, Tenant agrees with Landlord as follows:

    (a)    Landlord shall have the right to establish and from time to time modify standards of merchandise and standards of merchandising applicable to all of the Marketplace Area tenants, and Tenant shall at all times comply with and meet such standards then in effect.

    (b)    Tenant shall remove from sale and from the Marketplace Area any merchandise which, in the judgment of Landlord, does not meet the aforesaid standards, when and as directed by an employee of Landlord responsible for the management of the Marketplace Area (the "Marketplace Manager").

    (c)    In the event the Premises are located in The Food Court, Tenant's personnel, while working in the Premises, shall be attired in uniforms, the design of which shall be subject to Landlord's approval.

    (d)    All complaints against Tenant received by Landlord from customers will be promptly adjusted and satisfied to the satisfaction of the customer involved or the Marketplace Manager.

    (e)    Tenant shall comply with the oral or written directions of the Marketplace Manager with respect to any of the matters mentioned in clauses (b) and (d) above within three (3) days after such directions are given, and if the matter shall not be corrected to the satisfaction of the Marketplace Manager within such period, Landlord shall have the right to terminate this Lease effective as of the last day of the calendar month during which said three-day period shall have expired."

"Pest Control Service.

"Tenant agrees to obtain extermination services for the entire Premises at least once each month during the Term hereof, and any extensions and renewals thereof. Landlord may (but shall not be required to) make available to Tenant a contractor who will provide extermination services to the Premises in the course of providing such services to other tenants in the Marketplace Area, whereupon Tenant, if it so elects, shall contract with and pay such contractor directly. In lieu of the above, Tenant may obtain its own contractor to provide such extermination services; provided, however, that such contractor (a) performs at a level of quality equal to the contractor made available by Landlord, and (b) submits to Landlord, if requested, a certificate stating the date and frequency of performance of such extermination services."

Section 10.1. (The printed Section deals with Use of Common Areas):

-6-

Add the following to the end of the printed Section 10.1.: ", and to the pertinent provisions, if any, of the Ground Lease."

Section 10.3. (The printed Section deals with Employee Parking Areas):

The printed Section 10.3. is hereby deleted in its entirety.

Section 10.5. (The printed Section deals with "Landlord's Operating Costs" Defined):

Add the following after the word "services;" appearing in the thirty-third line of the printed Section 10.5.:

"depreciation for capital expenditures made by Landlord to reduce operating expenses if Landlord shall have reasonably determined that the annual reduction in operating expenses shall exceed depreciation therefor (depreciation shall be determined by dividing the original cost of such capital expenditure by the number of years of useful life of the capital item acquired and the useful life shall be reasonably determined by Landlord in accordance with generally accepted accounting principles and practices in effect at the time of acquisition of the capital item);".

Section 11.2. (The printed Section deals with Tenant's Contribution to Merchants' Association):

Delete the second and last sentences of the first paragraph of the printed Section 11.2.(a).

Delete the second and third paragraphs of the printed Section 11.2.(a).

Section 11.3. (The printed Section deals with Landlord's Contribution to Merchants' Association):

Delete the printed Section 11.3., and insert the following in lieu thereof:

"Landlord shall contribute to the Association for each Association Year, as and for its total annual contribution on behalf of all tenants at the Shopping Center, an amount equal to Seventy-Five Thousand Dollars ($75,000.00)."

Section 11.5. (The printed Section deals with Advertising):

Delete the printed Section 11.5. in its entirety.

Section 17.1. (The printed Section deals with "Event of Default" Defined):

(b) Before the word "The" in the first line of the printed Section 17.1.(b), insert the subclause designation "(i)" and change the period at the end of the printed Section 17.1.(b) to a semicolon and add the following: "or (ii) rejection of this Lease in a bankruptcy or similar proceeding by Tenant or by operation of law."

-7-

Section 18.1.    (The printed Section deals with Subordination):

After the word "Unless" appearing in the first line of the printed Section 18.1., insert the words "the City, the Authority or".

Change the designations for subsections "(a)" and "(b)" to "(b)" and "(c)", and insert the following as the new subsection (a):

"(a)  the Ground Lease, and".

Section 18.2.    (The printed Section deals with Mortgagee's Unilateral Subordination):

After the word "If" appearing in the first line of the printed Section 18.2., insert the words "the City, the Authority or"; before the word "Mortgage" appearing in the third and fourth lines, respectively, of the printed Section 18.2., insert the words "Ground Lease and/or" in each instance.

Section 20.13.    (The printed Section deals with No Option):

Delete the words, "and the affixation of the seal of such corporation".

Section 20.23.    (The printed Section deals with Relocation of Premises):

Delete the printed Section 20.23 in its entirety.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease under their respective hands as of the day and year first above written.

ATTEST:

FANEUIL HALL MARKETPLACE, INC., Landlord

_____
Assistant Secretary

By: _____
Vice-President

ATTEST

_____
Secretary

R & B ENTERPRISES LLC, Tenant

By: _____
President

-8-



CELLAR LEVEL          STREET LEVEL          SECOND LEVEL

NOT TO SCALE          NORTH MARKET BUILDING

# S C H E D U L E  "A"

TENANT:
**ZOINKS**
CENTER:
**FANEUIL HALL MARKETPLACE**

SCHEDULE A - 1

That certain lot or parcel of land situate in the City of Boston, County of Suffolk, Commonwealth of Massachusetts known and described as follows:

Beginning at a point being the intersection of the southerly sideline of Clinton Street and the westerly sideline of Commercial Street, also being a point on the Mass. Coordinate System, N496109.90, E720039.77,

thence running in a southerly direction on the westerly sideline of Commercial Street a distance of 50.25' along a bearing of S07°-46'-43"E,

thence a distance of 64.18' along a bearing of S07°-57'-00"E,

thence 51.75' along a bearing of S07°-47'-36"E,

thence 101.31' along a bearing of S06°-47'-46"E,

thence 64.57' on a bearing of S07°-35'-04"E,

thence turning and running along a westerly direction on the northerly sideline of Clinton Street a distance of 27.85' along a bearing of S82°-26'-16"W,

thence 234.50' along a bearing of S82°-26'-52"V,

thence 69.05' on a bearing of S82°-30'-07"V,

thence a distance of 188.48' on a bearing of S82°-26'-14"V,

thence 52.66' on a bearing of S78°-42'-56"V

thence turning and running in a northerly direction a distance of 63.93 along a bearing of N07°-57'-44"V

thence turning and running in a westerly direction a distance of 64.39' along a bearing of S82°-29'-17"V,

thence a distance of 0.68' on a bearing of S82°-34'-41"V,

thence turning and running in the northerly direction a distance of 2.00' along a bearing of N10°-43'-40"V,

thence turning and running in a westerly direction a distance of 75.45' along a bearing of S82°-26'-06"V,

thence turning and running in a northerly direction a distance of 62.87' along a bearing of N07°-54'-01"V,

thence turning and running in an easterly direction a distance of 132.77' on a bearing of N82°-43'-33"E,

thence turning and running in a northerly direction a distance of 161.00' along a bearing of N07°-55'-41"V,

thence turning and running in a westerly direction a distance of 133.39' along a bearing of S82°-36'-14"V,

thence turning and running in a northerly direction a distance of 48.31' along a bearing of N07°-55'-59"V, to a point,

thence turning and running along the southerly sideline of proposed North Street along an easterly arc of a curve to the right having a radius of 950.00' an arc distance of 93.31'.

thence continuing along an easterly arc of a curve to the right having a radius of 433.00' an arc distance of 50.01',

thence a distance of 44.38' along a bearing of N56°-02'-48"E,

thence along a southeasterly arc of a curve to the left having a radius of 11.00' an arc distance of 17.37',

thence a distance of 29.13' on a bearing of S36°-30'05"E,

thence turning and running in an easterly direction on the southerly sideline of Clinton Street a distance of 157.25' along a bearing of N82°-35'-17"E to the westerly property line of Durgin Park Parcel

thence turning and running in a southerly direction along the westerly sideline of Durgin Park a distance of 57.06' on a bearing of S07°-49'-25"E

thence turning and running in an easterly direction a distance of 66.00' on a bearing of N82°-26'-42"E,

thence turning and running in a northerly direction along the easterly property line of Durgin Park a distance of 57.09' on a bearing of N07°-49'28"V,

thence turning and running in an easterly direction a distance of 89.88' on a bearing of N82°-25'-17"E,

thence a distance of 152.55' on a bearing of N84°-28'-26"E,

thence a distance of 46.79' along a bearing of N84°-22'-47"E to the point of beginning.

Containing an area of two hundred nine thousand three hundred sixty three (209.363) square feet, more or less.



SCHEDULE "E"
UTILITY CONSUMPTION AND PAYMENT SCHEDULE

ANNEXED TO and forming part of the Lease by and between FANEUIL HALL
MARKETPLACE, INC. ("Landlord") and R & B ENTERPRISES LLC, a Massachusetts limited
liability company, t/a ZOINKS, ("Tenant").

Section 12.1. of the above mentioned Lease Agreement provides for the inclusion of this
Schedule as the basis for the determination of electricity used by Tenant in the Premises and the
payment therefor.

Landlord will furnish to the Premises electrical energy for Tenant's requirements, without
specific measurement of or charge for Tenant's consumption of electricity. It is intended that the
cost of such electrical energy be included in the Annual Basic Rental reserved under this Lease.
Since the use characteristics of Tenant's electrical equipment and fixtures are not yet known, it is
not presently possible for Landlord and Tenant to agree upon the component amount to be
included in Annual Basic Rental for electrical energy. For that reason the Annual Basic Rental
presently set forth in this Lease does not include the component amount for electrical energy and
the parties mutually desire to agree upon the method by which the amount of the Annual Basic
Rental will be ultimately fixed.

In consideration of the foregoing and of the mutual covenants hereinafter expressed,
Landlord and Tenant agree as follows:

1. As soon as possible, Tenant shall furnish Landlord with such information as Landlord or
Landlord's electrical engineer may reasonably require in order to estimate the connected load
which is used by Tenant's electrical fixtures, appliances and equipment (collectively "Tenant's
Electrical Installations") in the Premises. If Tenant fails to furnish Landlord such information,
Landlord shall make its estimate based on the best information available to Landlord. Based on
such information, Landlord or Landlord's electrical engineer shall make an estimate of the annual
total of average monthly charges (the "Electricity Component") which Tenant would otherwise
pay to the public utility or public authority furnishing such electrical energy in the area in which
the Shopping Center Area is located if such electrical energy were not furnished by Landlord.
The Electricity Component shall be added to and become part of the Annual Basic Rental.
Landlord shall notify Tenant in writing of the amount of the Electricity Component and if
Landlord requests, Tenant agrees to execute an amendment to this Lease, which amendment shall
confirm the increase in the Annual Basic Rental presently set forth in this Lease by the amount of
the Electricity Component. Failure on the part of Tenant to execute such amendment shall not
relieve Tenant from paying Annual Basic Rental, including the Electricity Component, promptly
when due.

3. If the filed rate (including fuel adjustment charges and all other charges) charged by the public utility for energy supplied to the Shopping Center Area shall be increased after the date on which the first Electricity Component is determined, the parties agree that the portion of the Annual Basic Rental represented by the Electricity Component shall be increased proportionately. Accordingly, such rental increase shall become effective on the first day of the month following any such rate increase. Upon written notice by Landlord to Tenant specifying such rate increase, this Lease and the Annual Basic Rental will be deemed to have been amended and increased, respectively, as provided in this paragraph above, and, if so requested by Landlord, Tenant shall execute an amendment to this Lease evidencing said increase.

Landlord shall provide water and sewer service to the Premises. Tenant shall pay all charges for water and sewer used by it and supplied by Landlord, a public utility or public authority, or any other person, firm or corporation. In addition to the foregoing, Tenant shall pay to Landlord, as Additional Rental, the annual Water and Sewer Charge set forth in clause O of Section 1.1. (if any), which annual sum shall be paid in twelve (12) equal monthly installments in advance on the first day of each calendar month during the Term, the first such payment to include also any prorated Water and Sewer Charge for the period from the date of the commencement of the Term to the first day of the first full calendar month in the Term.

**RECEIVED**

APR - 1 2004

FANEUIL HALL MARKETPLACE
MANAGEMENT

FIRST AMENDMENT TO LEASE

THIS AGREEMENT dated **MAR 2 9 2004** by and between FANEUIL HALL
MARKETPLACE, LLC, a Delaware limited liability company ("Landlord")
(successor in interest to FANEUIL HALL MARKETPLACE INC.), and R & B
ENTERPRISES, LLC, a Massachusetts limited liability company, t/a ZOINKS
("Tenant").

R E C I T A L S:

A.  Landlord and Tenant entered into a Lease dated March 14, 2002
(the "Lease"), for Premises containing 7,669 square feet located in the
Faneuil Hall Marketplace, Boston, Massachusetts.

B.  Landlord and Tenant desire to amend the terms and conditions of
the Lease.

NOW, THEREFORE, in consideration of the mutual covenants
hereinafter contained and for other good and valuable consideration, the
receipt and sufficiency of which are hereby acknowledged, the parties
hereto agree as follows:

1.  Annual Basic Rental.  Effective as of the date of execution of
this Amendment, Annual Basic Rental shall be an amount equal to the
product of the following applicable figure multiplied by the Floor Area
of the Premises, per annum:

| | | |
|---|---|---|
| 01/01/2003 through 12/31/2004 | | $10.98 |
| 01/01/2005 through 12/31/2005 | | $25.00 |
| 01/01/2006 through 12/31/2006 | | $36.00 |
| 01/01/2007 through Termination Date | | $40.50 |

2.  Unpaid Rental.  Prior to Tenant's execution of this
Amendment, Tenant's unpaid Rental due and owing Landlord as of December
1, 2003 totals Five Hundred Twelve Thousand Two Hundred Ninety Six and
05/100 Dollars ($512,296.05) ("Arrearage").  After Tenant's execution of
this Amendment, the retro-active rent relief for the 2003 calendar year
set forth in paragraph 1 of this Amendment will reduce the Arrearage to
Three Hundred Fifty Eight Thousand Seven Hundred Sixty Two and 76/100
Dollars ($358,762.76).  Effective upon the date of execution of this
Amendment subject to the next paragraph, Landlord agrees to forgive or
write/off the reduced Arrearage.

In consideration of Tenant's relief of Annual Basic Rental as
provided herein, Tenant's account with Landlord during the Lease Term
shall remain current.  If Tenant's account indicates any arrearages in
any Rental due, then without notice to Tenant, the preceding paragraph
will be automatically deemed null and void, and Tenant shall be
responsible for the payment of the reduced Arrearage as set forth in
this Amendment.

-1-

3.  **Landlord's Option to Terminate.**  Effective upon the date of execution of this Amendment, Landlord shall have the option to terminate the Lease by sixty (60) days advance written notice of its intert on to terminate to Tenant.  In the event the Lease is terminated as provided herein, all Rental and other charges set forth in the Lease shall be apportioned as of the date of termination in accordance with said notice.  Landlord's and Tenant's obligations to indemnify and hold harmless the other party as provided in Section 13.1 of this Leas and the obligations under Section 20.22 shall survive said terminatio as to any act, omission or occurrence which took place prior to such termination.  No further documentation shall be required to effic the termination of this Lease.  Either party, however, shall execut, upon reasonable request by the other, additional documentation for the sole purpose of documenting the termination of this Lease.

4.  **Tenant's Occupancy Charge.** Effective as of January 1, 2004 (the "Effective Date"), the following changes shall be made to the Lease:

(a) The following is added to Section 1.1.G. of the Lease

"'Tenant's Occupancy Charge' means an annual amount equal to the product of the following figure multiplied by Tenant's Floor Area $28.10, as adjusted pursuant to Section 5.1."

(b) The following is added to Section 5.1. of the Lease:

"Effective as of the Effective Date, Tenant's Occupancy Charge shall be paid by Tenant in equal monthly installments in advance on the first day of each calendar month during the Term. Tenant's Occupancy Charge shall be increased as of January 1st of each year during the Term by an amount equal to the greater of three percent (3%) or the percentage increase in the CPI multiplied by Tenant's Occupancy Charge for the prior calendar year. CPI' shall mean the Consumer Price Index for All Urban Consumers (U. S. City Average) published by the Bureau of Labor Statistics of the United States Department of Labor.  The percentage increase in the CPI shall be determined by (a) taking the September CPI most recently reported prior to the calendar year for which the increase is effective and subtracting the September CPI reported one year earlier (the 'Prior Period CPI') and (b) dividing the result by the Prior Period CPI.

"If during the Term the CPI is changed or discontinued, Landlord shall choose a comparable index, formula or other means of measurement of the relative purchasing power of the dollar and such substitute index, formula or other means of measurement shall be utilized in place of the CPI as if it had been originally designated in this Lease."

5.  **Deletion of Specific Lease Sections.** Effective as of the Effective Date, the following Sections of the Lease and any Rider provisions modifying those Sections are deleted in their entirety: Section 1.1.K. and Section 10.6. (Mall Heating, Ventilating and Air-Conditioning Equipment Contribution Rate),  Section 1.1.M. (Sprinkler Contribution Rate), Section 10.4. (Tenant to Share Expenses of Common Area), Section 10.5. (Landlord's Operating Costs Defined) and Section 13.8. (Tenant to Pay Proportionate Share of Insurance Costs).

6.  **Trash Removal Service.** Effective as of the Effective Date, Section 1.1.N. and Section 8.4. of the Lease, including the Rider, are

-2-

deleted in their entirety and the following inserted in lieu of S ction 8.4.:

"Section 8.4. Trash Removal Service.

"At its option, Landlord may furnish (or authorize others :( furnish) a service for the removal of tenant and Common Area tr:s from receptacles designated by Landlord for the regular deposit of g:r age, trash, rubbish or other refuse, and, if it shall do so, then in e ch Rental Year, at Landlord's election, Tenant shall either (i) re:m urse Landlord monthly, as Additional Rental, for all costs incurred ly Landlord in furnishing such service, or (ii) pay directly such (e son, firm or corporation authorized by Landlord to provide such trasl emoval services; provided, however, that all amounts which Tenant is ol l gated to pay to Landlord pursuant to clause (i) above shall not excee: he amounts which Tenant would otherwise be obligated to pay direct y to the same independent contractor utilized by Landlord for the remova. f such trash, if Tenant were dealing with such contractor at arm's lenct i for such trash removal services."

7.  Water and Sewer Service. Effective as of the Effective late:

Delete the last paragraph of Schedule E, Utility Consumpt:ɔ and Payment Schedule, and insert the following in lieu thereof:

"Tenant shall pay all charges for water and sewer used by i and supplied by a public utility or public authority, or any other ;e :son, firm or corporation."

8. Fire Protection Sprinkler System. Effective as of the f ective Date, the second sentence of the printed Section 12.3. is delet :c.

9. Tenant Heating, Ventilating and Air-Conditioning Schedl l . Effective as of the Effective Date, the Schedule F attached to .I : Lease is deleted and the attached Schedule F is inserted in lieu ther :c :.

10.  Release. As of the execution of this Agreement, each p rty hereby releases the other from any and all liabilities, claims, I ghts or causes of action arising out of any matters related to those i :ems of Additional Rental charges being eliminated in accordance with t Ii ; Agreement accrued or accruing as of the Effective Date.

11.  Execution by signature of an authorized officer of Ln lord shall be effective only upon attestation thereof by a corporate Secretary or Assistant Secretary of Landlord.

12.  All other terms and conditions of the Lease shall re a n and continue in full force and effect and shall be deemed unchanged e cept to the extent provided herein.

ebruary 4, 2004)

IN WITNESS WHEREOF, the parties hereto intending to be legal y bound hereby have executed this Agreement as of the day and year f rst above written.

ATTEST

Assistant Secretary

FANEUIL HALL MARKETPLACE, LLC, Landlord

By: _____
Vice-President

ATTEST:

Secretary

R & B ENTERPRISES, LLC, Tenant

By: _____
President

The undersigned, as Guarantors of the aforesaid Lease, hereb consent to the within Agreement, and hereby reconfirm and ratify t eir Guaranty of the Lease as amended herein.

WITNESS:

Brad Webster

THOMAS BROWN, Guarantor

WITNESS:

Stephanie L. Brown
STEPHANIE BROWN, Guarantor

-4-

## HVAC - A
## SCHEDULE "F"
## TENANT HEATING, VENTILATING AND AIR-CONDITIONING SCHEDULE

ANNEXED TO and forming part of the Lease by and between FANEUIL HALL MARKETPLACE, INC. ("Landlord") and R & B ENTERPRISES LLC, a Massachusetts limited liability company, t/a ZOINKS, ("Tenant").

Section 12.2. of the above mentioned Lease provides for the inclusion of this Schedule as the basis for establishing the obligations of Landlord and Tenant with regard to the heating, ventilating and air-conditioning equipment and system servicing the Premises and the cost of energy used to provide heating, ventilating and air-conditioning to the Premises.

### A. HVAC System:

Landlord and/or others have heretofore installed heating, ventilating and air-conditioning equipment and system serving the Premises and Landlord's Building. Tenant shall have use of Landlord's heating, ventilating and air-conditioning units in the Premises upon Tenant's acceptance of the Premises. Tenant will provide a sheet metal duct system. Landlord will provide and install at least one thermostat in Tenant's Premises, except for small or subdivided spaces which may share a thermostat. Landlord and Tenant shall each operate their respective portions of the facilities for heating, ventilating and air-conditioning the Premises during the Term. Landlord shall maintain, repair and operate such system at its expense, but subject to the payment by Tenant of the charges provided for herein. Upon the expiration or termination of the Term of this Lease Agreement, title to such additions and replacements shall remain in and shall vest solely in Landlord.

### B. Tenant's HVAC Charge:

In each calendar month of Landlord's fiscal year (the "Fiscal Year"), Tenant shall pay Landlord, as Additional Rental, Tenant's proportionate share of (i) the cost of energy used in heating, ventilating and air-conditioning Landlord's Floor Area and (ii)the cost of maintenance, repair and operation of such equipment and system as installed or owned by Landlord ("Tenant's HVAC Charge") which shall be determined as follows:

(i)     Landlord shall cause a heating, ventilating and air-conditioning consultant designated by Landlord to review such data and information regarding the mechanical capacity of said equipment and system as such consultant shall deem relevant and, based on such data and information, such consultant shall assign to Tenant an "HVAC Factor" which shall fairly represent the relationship between (x) the mechanical capacity of the equipment and system which is required for heating, ventilating and air-conditioning the Premises and (y) the total mechanical capacity of such equipment and system which is available for heating, ventilating and air-conditioning Landlord's Floor Area; and

(ii)    In each Fiscal Year, the actual cost to Landlord of such energy, operation, maintenance and repair as is attributable by Landlord to the heating, ventilating and air-conditioning of Landlord's Floor Area, together with costs and fees of Landlord's consultant in recalculating HVAC Factors of Tenant and other tenants of Landlord's Building from time to time, shall be multiplied by a fraction, the numerator of which is Tenant's HVAC Factor and the denominator of which is the total of all HVAC Factors assigned to leased Landlord's Floor Area. The product thus obtained shall be the Tenant's HVAC Charge for such Fiscal Year.

Tenant's HVAC Charge for each calendar month shall be paid by Tenant in such amounts as are estimated and billed by Landlord, each such charge being estimated and billed as of the first day of each Fiscal Year. At any time during each Fiscal Year, Landlord may reestimate Tenant's HVAC Charge and adjust Tenant's monthly installments payable during such Fiscal Year to reflect more accurately Tenant's HVAC Charge. Within one hundred twenty (120) days after the termination of each Fiscal Year, Landlord will send Tenant a notice which shall:

(iii)    set forth the amount of Tenant's HVAC Charge based upon Landlord's energy bills and maintenance, repair and operation costs for such Fiscal Year; and

(iv)    state that the aggregate of all tenant HVAC Charges paid or payable by all tenants of leased portions of Landlord's Floor Area with respect to such Fiscal Year, as adjusted, does not exceed the actual cost to Landlord of such energy, operation, maintenance and repair as is attributable by Landlord to the heating, ventilating and air-conditioning of Landlord's Floor Area, together with fees and costs of Landlord's consultant in recalculating HVAC Factors of Tenant and other tenants of Landlord's Building from time to time.

Tenant's HVAC Charge paid for such Fiscal Year shall be adjusted between Landlord and Tenant, the parties hereby agreeing that Tenant shall pay Landlord or Landlord shall credit to Tenant's account (or, if such adjustment is at the end of the Term, Landlord shall pay Tenant), as the case may be, within fifteen (15) days of such notification to Tenant, the amounts necessary to effect such adjustment. Failure of Landlord to provide the notification called for hereunder within the time prescribed shall not relieve Tenant of its obligations hereunder.

C.  HVAC Equipment:

In each Rental Year, Tenant shall pay Landlord annually (in twelve (12) equal monthly installments together with the Annual Basic Rental), as Additional Rental, an amount (the "HVAC Equipment Contribution") determined by multiplying the HVAC Equipment Contribution Rate by Tenant's Floor Area.



One International Place
18th Floor
Boston, MA 02110

fax 617 342 6899
www.eckertseamans.com

$EXH: 8.7$

December 20, 2004

**BY CONSTABLE**

Mr. Thomas Brown
R & B Enterprises LLC
89 Prince Street, No. 2
Boston, Massachusetts 02113

# NOTICE OF TERMINATION

**RE:     Lease Agreement dated March 14, 2002 by and between Faneuil Hall Marketplace, Inc.,  as Landlord, and R & B Enterprises LLC, t/a Zoinks, as Tenant, as Amended ( the  "Lease") for approximately 7,669 square feet of space located on the street level and second level of North Market Building, Faneuil Hall Marketplace, Boston, Massachusetts, as more particularly described in the Lease (the "Premises")**

Dear Sir/Madam:

Please be advised that this firm represents Faneuil Hall Marketplace LLC, successor-in-interest to Faneuil Hall Marketplace Inc. with respect to the Lease. Our client has informed us that you have failed to pay Rental and other sums of money due under the Lease within seven (7) days after the same became due. At present, the sum of Two Hundred Eighty One Thousand One Hundred Sixty Six Dollars and Ninety Five Cents ($281,166.95) is due and owing.

Pursuant to the provisions of Section 17.1(f) of the Lease, your failure to pay the above-referenced sums within seven (7) days after the same became due constitutes an Event of Default. As a result of this Event of Default, my client, under the provisions of Section 17.2(c) of the Lease, hereby elects to terminate the Lease effective immediately.

Demand is hereby made that you vacate, deliver up, and quit the Premises forthwith.

Please be advised that any amounts paid by you hereafter shall be accepted for use and occupancy only, without waiving this termination, creating a new tenancy, or reinstating the Lease.

{K0294057.1}
Anthony M. Moccia, Esquire
617.342.6828
amoccia@eckertseamans.com

**ECKERT**
**SEAMANS**

Mr. Thomas Brown
R & B Enterprises LLC
December 20, 2004
Page 2

Demand is hereby made that you produce this Notice at any summary process trial to evict you.

Very truly yours,

Anthony M. Moccia
Counsel for Faneuil Hall Marketplace LLC

AMM/cac

cc:   Thomas Brown
      89 Prince Street, No. 2
      Boston, Massachusetts 02113
      By Certified Mail Return Receipt Requested (7099 3220 0006 6166 5064)

      Stephanie Brown
      89 Prince Street, No. 2
      Boston, Massachusetts 02113
      By Certified Mail Return Receipt Requested (7099 3220 0006 6166 5071)

      R & B Enterprises LLC
      t/a Zoinks
      North Market Building
      Faneuil Hall Marketplace
      Boston, Massachusetts 02109
      By Constable

      Mr. Thomas Brown
      R & B Enterprises LLC
      213 Hanover Street, Suite 4
      Boston, Massachusetts 02113
      By Constable

      Mr. Thomas Brown
      R & B Enterprises, LLC
      213 Hanover Street, Suite 4
      Boston, Massachusetts 02113
      By Certified Mail Return Receipt Requested (7002 2030 0002 9801 8086)

{K0294057.1}

## *Affidavit of Service*

*On December 20, 2004, served said "<u>NOTICE OF TERMINATION</u>" upon R & B Enterprises, LLC, d/b/a Zoinks, 1 Faneuil Hall Marketplace, North Market Building, Boston, MA by serving "in-hand" upon Kerry Mulvaney, Manager, R & B Enterprises, LLC, d/b/a Zoinks at 1 Faneuil Hall Marketplace, North Market Building, Boston, MA @ 12:30 p.m.*

12-21-04

*Janet E. Carusi*

JANET E. CARUSI
Notary Public
Commonwealth of Massachusetts
My Commission Expires
April 26, 2005

John Roberto
Process Server & Disinterested Person





**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Article Sent To:

Thomas Brown

| | | |
|---|---|---|
| Postage | $ 37 | |
| Certified Fee | 230 | Postmark Here |
| Return Receipt Fee (Endorsement Required) | 125 | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 4.42 | |

Name (Please Print Clearly) (To be completed by mailer)
Thomas Brown
Street, Apt. No.; or PO Box No.
89 Prince St., Unit 2
City, State, ZIP+4 Boston, MA   02113

PS Form 3800, July 1999                 See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Kathleen Estan_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

1. Article Addressed to:

Stephanie Brown
89 Prince Street, No. 2
Boston, MA   02113

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

373 Wallace Rd
Goffstown NH 03045

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered   ☒ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7099 3220 0006 6166 5071

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To:

Stephanie Brown

| | | |
|---|---|---|
| Postage | $ | 37 |
| Certified Fee | | 2 30 |
| Return Receipt Fee (Endorsement Required) | | 1 25 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 4.42 |

Postmark Here

Name (Please Print Clearly) (To be completed by mailer)
Stephanie Brown
Street, Apt. No.; or PO Box No.
89 Prince Street, No. 2
City, State, ZIP+4   Boston, MA   02113

7099 3220 0006 6166 5071

PS Form 3800, July 1999    See Reverse for Instructions

*Affidavit of Service*

*On December 22, 2004, served said "NOTICE OF TERMINATION" upon Mr.*

*THOMAS BROWN, R & B Enterprises, LLC, by leaving "last & usual" at 213*

*Hanover Street, Suite 4, Boston, MA. Also mailed copy of summons, via 1st class mail*

*to above address.*

12-22-04

*Janet E. Carusi*

JANET E. CARUSI
Notary Public
Commonwealth of Massachusetts
My Commission Expires
April 26, 2005

John Roberto
Process Server & Disinterested Person

*Affidavit of Service*

*On December 22, 2004, served said "<u>NOTICE OF TERMINATION</u>" upon Mr.*

*THOMAS BROWN, R & B Enterprises, LLC, by leaving "last & usual" at 89 Prince*

*Street, No. 2, Boston, MA. Also mailed copy of summons, via 1ˢᵗ class mail to above*

*address.*

12-22-04

Janet E. Carusi

JANET E. CARUSI
Notary Public
Commonwealth of Massachusetts
My Commission Expires
April 26, 2005

John Roberto
Process Server & Disinterested Person

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Thomas Brown
R & B Enterprises, LLC
213 Hanover St., Suite 4
Boston, MA 02113

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

373 Wallace Rd
Goffstown NH 03045

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7002 2030 0002 9801 8086

Domestic Return Receipt                          102595-02-M-1540



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Reciept Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

POINT STA BOSTON MA 02205
DEC 30 2004
USPS-79

Sent To
Mr. Thomas Brown
Street, Apt. No.; or PO Box No.  R & B Enterprises, LLC
City, State, ZIP+4  213 Hanover St, Suite 4
Boston, MA 02113

PS Form 3800, June 2002                    See Reverse for Instructions

8086 9801 0002 2030 7002

**Faneuil Hall Marketplace**
**Summary of Charges--Zoinks**
**2005**

|         | Monthly Amount |           |            |
|---------|---------------:|-----------|-----------:|
| RMIN    |      15,977.08 | x 12 mos  | 191,724.96 |
| OPCG    |      18,496.99 | x 12 mos  | 221,963.88 |
| MATD    |       3,355.18 | x 12 mos  |  40,262.16 |
| RET     |       8,039.66 | x 12 mos  |  96,475.92 |
| TRSH    |       1,329.29 | x 12 mos  |  15,951.48 |
| THVC    |         800.00 | x 12 mos  |   9,600.00 |
| TLP     |       1,675.00 | x 12 mos  |  20,100.00 |
|         |                |           | 596,078.40 |

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 05-3275 A | Trial Court of Massachusetts Superior Court Department County: Suffolk |
|---|---|---|

**PLAINTIFF(S)**
FANEUIL HALL MARKETPLACE, LLC.

**DEFENDANT(S)**
THOMAS BROWN, a/k/a THOMAS A BROWN AND
STEPHANIE BROWN, a/k/a STEPHANIE L. BROWN

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE 617.342.6828
Anthony M. Moccia, BBO #350225
Eckert Seamans Cherin & Mellott, LLC
Board of Bar Overseers number: International Place, Boston, MA 02110

ATTORNEY (if known)

**Origin code and track designation**

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 & 104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| A08· | sale or lease of real estate | ( F ) | ( ) Yes ( x ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . $. . . . . . . . . . .
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
Subtotal $. . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F. Other documented items of damages (describe)
$. . . . . . . . . . .
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$. . . . . . . . . . .
TOTAL $. . . . . . . . . . .

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):
Defendants owe Plaintiff the sum of $625,506.91, plus interest, costs, and attorney's fees due under a written lease guaranty.

TOTAL $. 625,506.91

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _Anthony M. Moccia_    DATE: 8-3-05

AOTC-6 mic005-11/99
A.O.S.C. 1-2000

I HEREBY ATTEST AND CERTIFY ON
AUGUST 26, 2005 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
ASSISTANT CLERK.

.**3**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 05-3275A

| | |
|---|---|
| FANEUIL HALL MARKETPLACE, LLC, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS BROWN, a/k/a THOMAS A. | ) |
| BROWN AND STEPHANIE BROWN, | ) |
| a/k/a STEPHANIE L. BROWN, | ) |
|     Defendants. | ) |

### AFFIDAVIT OF COMPLIANCE WITH REQUIREMENTS FOR SERVICE OF PROCESS ON NON-RESIDENT DEFENDANT

NOW COMES your affiant, Anthony M. Moccia, and, upon oath, deposes and states as follows:

1. I am an attorney in the law firm of Eckert Seamans Cherin & Mellott, One International Place, 18th Floor, Boston, Massachusetts, and I represent the Plaintiff in the within action.

2. On August 4, 2005, I served copies of the Complaint, Summons and Civil Action Cover Sheet, by certified mail, first class mail, return receipt requested upon the Defendant, Thomas Brown, a/k/a Thomas A. Brown. The receipt for certified mail is annexed hereto as Exhibit "A".

3. As appears from the return receipt which is attached hereto as Exhibit "B", the Defendant, Thomas Brown, a/k/a Thomas A. Brown, received the Complaint, Summons and Civil Action Cover Sheet no later than August 8, 2005.

{K0308200.1}

Sworn to under the pains and penalties of perjury this 11th day of August, 2005.

_Anthony M. Moccia_
Anthony M. Moccia

**I HEREBY ATTEST AND CERTIFY ON**

AUGUST 26, 2005, **THAT THE**

**FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.**

**MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT**

**BY:** _Lorraine A. Center_

ASSISTANT CLERK.

{K0308200.1}

 

Eckert Seamans Cherin & Mellott, LLC
One International Place
18th Floor
Boston, MA 02110

tel 617 342 6800
fax 617 342 6899
www.eckertseamans.com

Anthony M. Moccia
617.342.6828
amoccia@eckertseamans.com

August 4, 2005

## CERTIFIED MAIL NO. 7002 2030 0002 9801 8291
## RETURN RECEIPT REQUESTED

Mr. Thomas Brown
30 Myrica Avenue
Rye Beach, New Hampshire 03871

Re:    Faneuil Hall Marketplace, LLC v. Thomas Brown, et al.; Suffolk Superior Court;
       Civil Action No. 05-3275A

Dear Mr. Brown:

Please be advised that this office represents the Plaintiff, Faneuil Hall Marketplace, LLC.

You are served with the following documents which are enclosed:

     1.    Copy of Complaint in the case of Faneuil Hall Marketplace, LLC v. Thomas
Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-3275A;

     2.    Copy of Summons directed to you in the case of Faneuil Hall Marketplace, LLC
v. Thomas Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-
3275A; and

     3.    Copy of Civil Action Cover Sheet in the case of Faneuil Hall Marketplace, LLC
v. Thomas Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-
3275A.

Service in this proceeding is made upon you by certified mail pursuant to the provisions of
Massachusetts General Laws, Chapter 223A, Section 1 et. seq. and

{K0307747.1}

Mr. Thomas Brown
August 4, 2005
Page 2

Rule 4 of the <u>Massachusetts Rules of Civil Procedure</u>. Please note that you are required to respond to the Complaint within twenty (20) days. I would suggest, therefore, that you refer this matter to your attorney for action.

Very truly yours,

Anthony M. Moccia

AMM/cw
Enclosures

BOSTON, MA    PITTSBURGH, PA    HARRISBURG, PA    PHILADELPHIA, PA    WASHINGTON, DC    WILMINGTON, DE
MORGANTOWN, WV    SOUTHPOINTE, PA    ALCOA CENTER, PA

{K0307747.1}

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-3275 A

FANEUIL HALL MARKETPLACE, LLC _____ , Plaintiff(s)

v.

THOMAS BROWN, A/K/A THOMAS A. BROWN
AND STEPHANIE BROWN A/K/A STEPHANIE L.
BROWN _____ , Defendant(s)

## SUMMONS

To the above-named Defendant: Thomas Brown, a/k/a Thomas A. Brown

You are hereby summoned and required to serve upon Anthony M. Moccia, Eckert Seamans Cherin & Mellott, LLC

plaintiff's attorney, whose address is 1 International Place, Boston, MA 02110 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse** , Esquire, at Boston, the 3rd day of August , in the year of our Lord two thousand five .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

(1) TORT    (2) MOTOR VEHICLE TORT    (3) CONTRACT    (4) EQUITABLE RELIEF    (5) OTHER

FORM CIV.P. 1 3rd Rev.

# Exhibit A



## Exhibit B

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* | |
|---|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ | ☐ Agent<br>☐ Addressee |
| | B. Received by (*Printed Name*) | C. Date of Delivery<br>8/8/05 |
| 1. Article Addressed to:<br><br>Mr. Thomas Brown<br>30 Myrica Ave.<br>~~Rye Beach,~~ N.H. ~~03871~~<br><br>Rye NH<br>03870 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br>SUCV<br>05 · 3275 | |
| | 3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D. | |
| | 4. Restricted Delivery? (*Extra Fee*)  ☐ Yes | |
| 2. Article Number<br>(*Transfer from service label*) | 7002 2030 0002 9801 8291 | |
| PS Form 3811, February 2004 | Domestic Return Receipt | 102595-02-M-1540 |

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                                CIVIL ACTION
                                                NO. 05-3275A

FANEUIL HALL MARKETPLACE, LLC, )
    Plaintiff,                            )
                                               )
v.                                             )
                                               )
THOMAS BROWN, a/k/a THOMAS A.                  )
BROWN AND STEPHANIE BROWN,                     )
a/k/a STEPHANIE L. BROWN,                      )
    Defendants.                           )

## AFFIDAVIT OF COMPLIANCE WITH REQUIREMENTS
## FOR SERVICE OF PROCESS ON NON-RESIDENT DEFENDANT

NOW COMES your affiant, Anthony M. Moccia, and, upon oath, deposes and states as

follows:

    1.    I am an attorney in the law firm of Eckert Seamans Cherin & Mellott, One

International Place, 18th Floor, Boston, Massachusetts, and I represent the Plaintiff in the within

action.

    2.    On August 4, 2005, I served copies of the Complaint, Summons and Civil Action

Cover Sheet, by certified mail, first class mail, return receipt requested upon the Defendant,

Stephanie Brown, a/k/a Stephanie L. Brown. The receipt for certified mail is annexed hereto as

Exhibit "A".

    3.    As appears from the return receipt which is attached hereto as Exhibit "B", the

Defendant, Stephanie Brown, a/k/a Stephanie L. Brown, received the Complaint, Summons and

Civil Action Cover Sheet no later than August 8, 2005.

{K0308215.1}

Sworn to under the pains and penalties of perjury this 11th day of August, 2005.

Anthony M. Moccia

**I HEREBY ATTEST AND CERTIFY ON**

AUGUST 26, 2005 , **THAT THE**

**FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.**

**MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT**

BY

ASSISTANT CLERK.

# ECKERT
# SEAMANS

Eckert Seamans Cherin & Mellott, LLC
One International Place
18th Floor
Boston, MA 02110

TEL 617 342 6800
FAX 617 342 6899
www.eckertseamans.com

Anthony M. Moccia
617.342.6828
amoccia@eckertseamans.com

August 4, 2005

## CERTIFIED MAIL NO. 7002 2030 0002 9801 8284
## RETURN RECEIPT REQUESTED

Ms. Stephanie Brown
30 Myrica Avenue
Rye Beach, New Hampshire 03871

Re:     Faneuil Hall Marketplace, LLC v. Thomas Brown, et al.; Suffolk Superior Court;
        Civil Action No. 05-3275A

Dear Ms. Brown:

Please be advised that this office represents the Plaintiff, Faneuil Hall Marketplace, LLC.

You are served with the following documents which are enclosed:

     1.     Copy of Complaint in the case of Faneuil Hall Marketplace, LLC v. Thomas
Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-3275A;

     2.     Copy of Summons directed to you in the case of Faneuil Hall Marketplace, LLC
v. Thomas Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-
3275A; and

     3.     Copy of Civil Action Cover Sheet in the case of Faneuil Hall Marketplace, LLC
v. Thomas Brown, et al.; Suffolk County, Commonwealth of Massachusetts, Docket No. 05-
3275A.

Service in this proceeding is made upon you by certified mail pursuant to the provisions of
Massachusetts General Laws, Chapter 223A, Section 1 et. seq. and Rule 4 of the Massachusetts

BOSTON, MA    PITTSBURGH, PA    HARRISBURG, PA    PHILADELPHIA, PA    WASHINGTON, DC    WILMINGTON, DE
MORGANTOWN, WV    SOUTHPOINTE, PA    ALCOA CENTER, PA

{K0307746.1}

**ECKERT**
**SEAMANS**

Ms. Stephanie Brown
August 4, 2005
Page 2

Rules of Civil Procedure. Please note that you are required to respond to the Complaint within twenty (20) days. I would suggest, therefore, that you refer this matter to your attorney for action.

Very truly yours,

Anthony M. Moccia

AMM/cw
Enclosures

BOSTON, MA    PITTSBURGH, PA    HARRISBURG, PA    PHILADELPHIA, PA    WASHINGTON, DC    WILMINGTON, DE
MORGANTOWN, WV    SOUTHPOINTE, PA    ALCOA CENTER, PA

{K0307746.1}

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-3275A

FANEUIL HALL MARKETPLACE, LLC

—————————————————————————————— , Plaintiff(s)

v.

THOMAS BROWN, a/k/a THOMAS A. BROWN AND
STEPHANIE BROWN, a/k/a STEPHANIE L. BROWN

—————————————————————————————— , Defendant(s)

## SUMMONS

To the above-named Defendant: Stephanie Brown, a/k/a Stephanie L. Brown

You are hereby summoned and required to serve upon Anthony M. Moccia, Eckert Seamans Cherin & Mellott, LLC

plaintiff's attorney, whose address is 1 International Place, Boston, MA 02110 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse** ~~Suzanne V. DelVecchio~~, Esquire, at Boston, the 3rd day of August , in the year of our Lord two thousand five .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES

1   This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2   When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3   TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

   (1) TORT    (2) MOTOR VEHICLE TORT    (3) CONTRACT    (4) EQUITABLE RELIEF    (5) OTHER

FORM CIV.P. 1 3rd Rev.

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## Exhibit A



## Exhibit B

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by ( *Printed Name* )   C. Date of Delivery   8/8/05 |
| 1. Article Addressed to:<br><br>Ms. Stephanie Brown<br>  30 Myrica Ave.<br>~~Rye Beach~~, New Hampshire ~~03871~~<br><br>RYE NH 03870 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br>BUCV<br>05·3275 |
| | 3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? ( *Extra Fee* )   ☐ Yes |
| 2. Article Number<br>   *(Transfer from service label)* | 7002 2030 0002 9801 8284 |
| PS Form 3811, February 2004 | Domestic Return Receipt | 102595-02-M-1540 |